**STATE of Tennessee**

**v.**

**Danny STRODE.**

Supreme Court of Tennessee,
at Nashville.

May 30, 2007 Session Heard
at Cookeville [1].

Aug. 14, 2007.

1. Oral argument was heard in this case on May 30, 2007, at Boys' State in Cookeville, Putnam County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Cynthia A. LeCroy–Schemel, Chattanooga, Tennessee, for the appellant, Danny Strode.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Associate Deputy Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and GARY R. WADE, JJ., joined.

In this capital case, we consider whether the State may pursue an interlocutory appeal from a trial court's determination that a defendant is ineligible for the death penalty due to mental retardation. Upon holding that it may, we also consider whether the trial court erred in finding the Defendant, Danny Strode, mentally retarded as set forth in Tennessee Code Annotated section 39–13–203(a) (2003). We hold that Tennessee Code Annotated section 39–13–203(a) requires that a defendant's mental retardation must have been manifested by eighteen years of age. Because the proof in this case preponderates against the trial court's finding that the

Defendant's mental retardation manifested by his eighteenth birthday, we hold that the trial court erred in finding the Defendant to be mentally retarded and therefore ineligible for the death penalty. Accordingly, we affirm the judgment of the Court of Criminal Appeals. This matter is remanded to the trial court for further proceedings consistent with this opinion.

*Factual Background*

The Defendant, Danny Strode, is charged with premeditated murder, felony murder, and especially aggravated robbery in the December 17, 2001, death of Bledsoe County store owner Harvey J. Brown. On that date, the Defendant was twenty years of age.[2] After the State filed a Notice of Intent to Seek Death Penalty, the defense filed a Motion to Strike the Notice on the basis that the Defendant suffered from mental retardation under the criteria of Tennessee Code Annotated section 39–13–203(a) and was thus ineligible for the death penalty.[3] Following psychological examination, a hearing was held on the Motion to Strike.

To place the evidence in context, the factual determination before the trial court was whether the Defendant met the criteria for mental retardation as that condition is defined in the statute. Tennessee Code Annotated section 39–13–203(a) defines "mental retardation" to mean:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3) The mental retardation must have been manifested during the developmen-

---

2. According to documents in the record, the Defendant's date of birth is July 10, 1981.

3. Our criminal code provides that "no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death." Tenn.Code Ann. § 39–13–203(b) (2003).

tal period, or by eighteen (18) years of age.

Tenn.Code Ann. § 39–13–203(a) (2003). Furthermore, it is the Defendant's "burden of production and persuasion to demonstrate mental retardation by a preponderance of the evidence." *Id.* at (c).

The first witness to testify was Margie Strode Crawford, the Defendant's adoptive mother. Ms. Crawford testified that she took the Defendant into her home as a foster child in the spring of 1993 when he was eleven years old. She later adopted him. The Defendant stayed in her home for approximately two years before leaving at the age of thirteen or fourteen. Ms. Crawford testified that when he lived with her, the Defendant tended to be a loner, had a hard time making friends, and did not "fit in." He also had problems with basic personal hygiene, and she had to constantly remind him to brush his teeth and bathe. School was difficult for him. Ms. Crawford testified that, based on the problems the Defendant had during the period he lived with her, she did not believe he would ever be able to live independently. Ms. Crawford admitted, however, that she did not have any contact with the Defendant from 1996 until 2001 when the crime in this case was committed.

Clinical psychologist Dr. Robert W. Brown, Jr., also testified for the defense. Dr. Brown evaluated the Defendant for a total of twenty hours over the course of four days in 2004. The evaluation process included clinical observations, interviews, a review of records, and psychological testing. Dr. Brown began the testing process by giving the Defendant a series of tests to determine whether he was malingering—

that is, attempting to exaggerate deficits or problems, or attempting to feign deficits or problems that he did not actually have. Dr. Brown concluded on the basis of these tests that the Defendant was not malingering.

As to the first prong of the statute, whether the Defendant had "significantly subaverage general intellectual functioning," Dr. Brown's intelligence quotient (I.Q.) testing indicated that the (then twenty-three-year-old) Defendant had a functional I.Q. of 69, which placed him in the category of "mentally retarded." Dr. Brown admitted that this was the lowest score the Defendant had ever received on any I.Q. test, and the Defendant had never received an I.Q. score of 70 or below prior to this test. Tests given the Defendant earlier in life had higher results: an I.Q. of 88 at the age of eight, 75 at the age of eleven, 78 at the age of thirteen, and 78 at the age of fifteen.[4] Dr. Brown opined that the Defendant's I.Q. had likely dropped over time due to a learning disability. He admitted on cross-examination, however, that the results from the tests administered in 2004, when the Defendant was twenty-three years old, could not necessarily be projected back to support the proposition that he had an I.Q. of 70 or less before he was eighteen years old.

As to the second prong of the statute, deficits in adaptive behavior, Dr. Brown admitted that there was no formal assessment of the Defendant's adaptive functioning during his school-age years. Furthermore, he found that the Defendant was not a useful source of information on this point because he had memory problems. For that reason, Dr. Brown relied on Ms.

---

**4.** An I.Q. test given to the Defendant in 2003, when he entered the Department of Correction, yielded an I.Q. of 84. However, the test used by the Department of Correction, the "BETA III," was different from the test used to obtain the results when the Defendant was a child, an adolescent, and by Dr. Brown, which was the "WAIS–III." Dr. Brown testified that the WAIS–III was the most common and popular test used to determine I.Q.

Crawford's account of the Defendant's adaptive skills, a report from Youth Villages,[5] and his own observations during the evaluation. The report from Youth Villages, made when the Defendant was nineteen years old, stated that he "lack[ed] the independent living skills necessary for successful living following discharge." Dr. Brown concluded that the Defendant had a "significant deficit in adaptive functioning" prior to the age of eighteen.

Regarding the third prong of the statute, whether the mental retardation manifested during the developmental period, or by eighteen years of age, Dr. Brown responded that, "[t]o my satisfaction the problem we have today he had when he was in kindergarten, so it was before 18, yes." He acknowledged that previous test scores did not show an I.Q. of 70 or less before the Defendant was eighteen years of age. Even though his testing led him to a conclusion that the Defendant was mentally retarded in 2004 at the age of twenty-three, Dr. Brown conceded that the records upon which he based his opinion "[did] not show that he meet[s] the criteria of diagnosis for mild mental retardation [prior to age eighteen]."

Dr. Brown also acknowledged that the records reflected that at the age of fifteen, the Defendant enjoyed such activities as playing in the woods, riding bicycles, and playing on a community football team—activities in which any average fifteen-year-old boy would engage. He further acknowledged that as an adult, the Defendant had worked as a backhoe operator, a dairy farmer, a factory worker, a baby-sitter, and in the fast-food industry. The Defendant had also earned a driver's license.

Ultimately, Dr. Brown admitted that the Defendant's mental retardation did not manifest itself in the records prior to the age of eighteen. However, he opined that the "developmental period" cited in the statute referred to brain and cognitive functioning. According to Dr. Brown, the brain does not reach maturity until the age of twenty-four to twenty-six years old. His testing of the Defendant, done at age twenty-three, therefore confirmed mental retardation manifested during the developmental period.

Clinical psychologist Eric Engum testified for the State. Dr. Engum did not personally interview the Defendant. He reviewed the tests conducted by Dr. Brown, as well as the psychological reports done prior to the Defendant's eighteenth birthday that Dr. Brown relied upon in his evaluation of the Defendant. As to the first prong of the statute, significantly sub-average general intellectual functioning, Dr. Engum testified that prior to Dr. Brown's tests, no previous evaluation of the Defendant showed that he had an I.Q. lower than 70. Every psychological evaluation up to that time indicated that the Defendant was in the "borderline range of intellectual functioning" but was not mentally retarded under this standard. Dr. Engum was more ambivalent than Dr. Brown about the possibility that the Defendant was malingering. While he agreed there was no "compelling" or "clear and convincing" evidence of malingering, he opined that some of the test results suggested that the Defendant was not putting forth a full effort.

As to the second prong of the statute, deficits in adaptive behavior, Dr. Engum questioned the reliability of assessing the

5. Youth Villages is a private, non-profit organization working with the State of Tennessee Department of Children's Services to assist children that have been removed from their homes. The services offered include counseling and treatment, foster care, and adoption.

Defendant's adaptive behavior at age thirteen and then projecting or extrapolating how the Defendant would function later in life. He saw no evidence in the records that the Defendant suffered from deficits in adaptive behavior prior to age eighteen that could be associated with mental retardation, and insufficient evidence that the Defendant exhibited deficits in adaptive behavior at the time of the commission of the offense. Noting the Defendant's ability to operate a motor vehicle, hold a job, establish a residential living situation, and babysit a child, Dr. Engum concluded that the Defendant "had some capacity to adapt to his environment and, at least, function within it at some level."

Finally, as to whether mental retardation manifested during the Defendant's developmental period, or before the age of eighteen, Dr. Engum testified that authoritative texts on the subject, specifically the *Diagnostic and Statistical Manual [of Mental Disorders]* (DSM IV) and the American Association on Mental Retardation's *Mental Retardation: Definition Classification and Systems of Supports* 9th Edition, defined mental retardation as having an onset prior to age eighteen. As he explained it, the diagnosis of mental retardation indicates the occurrence of a condition, injury, or neuropsychological event prior to age eighteen. Dr. Engum could find nothing in the tests or reports that indicated the presence of mental retardation before the age of eighteen. He did believe that the Defendant had a variety of emotional, behavioral, motivational, and environmental problems, and potentially problems related to Attention Deficit Hyperactivity Disorder with a learning disability. Nevertheless, there was never an official diagnosis of mental retardation and there was never an I.Q. score that supported that diagnosis until Dr. Brown's testing in 2004. Dr. Engum did agree,

however, that the result of Dr. Brown's tests showed an I.Q. of 69 at that time.

At the conclusion of the hearing on the Motion to Strike the Death Penalty, the trial court determined that the Defendant was mentally retarded for purposes of Tennessee Code Annotated section 39-13-203. The pertinent findings of the trial court were as follows:

The first prong of the statutory definition of mental retardation requires an I.Q. of seventy (70) or below. Dr. Robert W. Brown, Jr., testified on behalf of the defendant. He is [e]minently qualified and found defendant's I.Q. at the age of 23 to be 69. Dr. Eric Engum testified on the state's behalf and agreed defendant's I.Q. at age 23 was 69, even though he disagreed with some of Dr. Brown's procedures and reasoning. Dr. Brown further testified defendant would have had the same I.Q. of 69 at age 20. Defendant was 21 years of age when he was charged with the murder of Harvey Brown. Thus, defendant has established the first prong of the test.

The second prong of the test for mental retardation under our statute requires "deficits in adaptive behavior" which has been defined as "the inability of an individual to behave so as to adapt to surrounding circumstances." *State v. Smith*, 893 S.W.2d 908, 918 (Tenn.1995). Defendant's adaptive behavior deficits were established by Dr. Brown's report and by his and Ms. Crawford's testimony. The proof established defendant has significant limitations in the areas of communication, self-care, home living, social skills, self-direction, functional academics and work. Therefore, defendant has established the second prong of the statutory definition of mental retardation.

The third and final prong of the test requires defendant's intellectual and

adaptive deficits to "have manifested during the development[al] period, or by eighteen (18) years of age." The statute therefore provides two means by which the deficits can be manifested; either (1) during this developmental period or (2) by age 18.

As to the first method, T.C.A. § 33–1–101(17)(B) in defining mental retardation for mental health and developmental disabilities purposes, requires that deficits in intellectual and adaptive skills "manifest before eighteen (18) years of age." This court must presume that the legislature was aware of that definition when it enacted § 33–13–203(a)(3), yet purposely chose to adopt a different definition of mental retardation to be applied in the criminal context. While the two statutes both touch upon the same subject matter, they do not contain identical provisions. This court notes that essentially, the state argues the words "or by" in T.C.A. § 33–13–203(a)(3) should be read "which is defined as." Clearly, the legislature could have defined "developmental period" as between birth and the eighteenth birthday, but chose not to do so. The addition of another time frame to prove mental retardation above that required in T.C.A. § 33–1–101(17)(B) is indicative of the legislature's intent to have a different standard apply to defendants in a capital prosecution.

Neither the statutes nor case law in Tennessee define "developmental period." Dr. Brown defined the term in his testimony: "The developmental period, it[']s an issue in this case, has to do with the brain and cognitive function and its [sic] birth through roughly the maturity of the brain is between ages 24 and 26." Applying Dr. Brown's definition of "developmental period" which is the only definition in the proof, and accrediting Dr. Brown's report and testimony, this court finds the third prong of the test

has been established. *See also* 20 C.F.R. pt. 404 subpt. P, app. 1512(c) (defining developmental period in social security cases to be by age 22).

In the alternative, this court has considered the second method to establish the required deficits which is "by eighteen (18) years of age." The records established that the defendant's I.Q. was tested four times by age 15. No testing, however, was performed between ages 15 and 18. Although his first score at age 8 showed an I.Q. of 88, his I.Q. in 1992 at age 11 was shown to be 75. Both at age 13 and 15 the test produced an I.Q. of 78. On his 1992 report, the tester indicated that once the standard error of measurement was considered, his score may have fallen within the mild retardation range. Dr. Brown reported defendant's academic achievement decreased over time which he believed established a decreasing I.Q. Under all the circumstances, and with the testimony and evidence of the defendant's decreasing abilities with age and his continued inability to adapt, the court finds by a preponderance of the evidence that the defendant's mental retardation manifested prior to age 18 assuming *arguendo* that such is the standard. Since defendant has established all three prongs of the test, this court finds defendant was mentally retarded as defined in T.C.A. § 39–13–203(a) at the time of the offense and is ineligible for the death penalty pursuant to T.C.A. § 39–13–203(b).

The State requested, and was granted, an interlocutory appeal from the trial court's determination that the Defendant was mentally retarded. The Court of Criminal Appeals reversed the trial court, concluding first that the evidence preponderated against the trial court's finding that mental retardation was manifested prior to the age of eighteen. The court

noted that despite Dr. Brown's speculation that the Defendant's problems existed prior to age eighteen, there was no actual proof in the record that the Defendant had an I.Q. less than 70 or that he suffered from deficits in adaptive behavior before reaching eighteen years of age. Next, the court concluded as a matter of law that the language of section 39–13–203(a) required a finding of mental retardation prior to the age of eighteen. In reaching this conclusion, the Court of Criminal Appeals performed a painstaking analysis of the legislative history of the statute and the prior decisions of this Court.

### Standard of Review

■■■ Our criminal code provides that "[t]he determination of whether the defendant was mentally retarded at the time of the offense of first degree murder shall be made by the court." Tenn.Code Ann. § 39–13–203(c) (2003). When an accused is afforded an evidentiary hearing on the merits of a motion in the trial court, the findings of fact made by that court are binding upon the appellate court unless the evidence contained in the record preponderates against those findings. *See State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996) (findings on a motion to suppress a confession); *State v. Moore,* 775 S.W.2d 372, 374 (Tenn.Crim.App.1989) (findings on a motion to suppress evidence seized in a search). This standard of review developed because the trial court, as the trier of fact, must assess the credibility of the witnesses, determine the weight and value to be afforded the evidence adduced during the hearing, and resolve any conflicts in the evidence. *Odom,* 928 S.W.2d at 23. However, the application of the law to those facts is a question of law which this Court reviews de novo with no presumption of correctness. *State v. Garcia,* 123 S.W.3d 335, 343 (Tenn.2003) (citing *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997), and *Beare Co. v. Tenn. Dep't of Revenue,* 858 S.W.2d 906, 907 (Tenn.1993)).

This same standard of review is applicable to issues which are raised in a discretionary appeal pursuant to either Rule 9 or Rule 10 of the Tennessee Rules of Appellate Procedure. As the court stated in *Moore,* "Issues raised by an interlocutory or extraordinary appeal, after permission to appeal has been granted, are decided in the same manner as if the issues had been raised in an appeal as of right." 775 S.W.2d at 374. In this case, the question of whether an accused is mentally retarded for the purposes of application of the death penalty is a mixed question of law and fact.

### Legal Analysis

#### Availability of Interlocutory Review Where Trial Court Determines Defendant is Mentally·Retarded

■■■ As a preliminary matter, the Defendant challenges the propriety of interlocutory review of the trial court's determination that he is mentally retarded.[6] He asserts that the language of Tennessee Code Annotated subsections 39–13–203(c) and (f), when read together, indicate that this is a decision that lies solely with the trial court.[7] After reviewing the plain lan-

6. Although the State's position is that this issue is waived for failure to raise an objection in the Court of Criminal Appeals, we note that the Defendant's Court of Criminal Appeals brief does include a challenge, albeit brief, to the propriety of granting interlocutory review on a trial court's decision that a defendant is mentally retarded under the criteria of Tennessee Code Annotated section 39–13–203.

7. Whether a court has jurisdiction is a question of law over which our review is de novo with no presumption of the correctness of the ruling of the lower courts. *State v. Cawood,* 134 S.W.3d 159, 163 (Tenn.2004).

guage of section 39–13–203, along with the provisions of Rules 3 and 9 of the Tennessee Rules of Appellate Procedure, we conclude that interlocutory review is appropriate.

In 1990, the Tennessee General Assembly, following the lead of the Georgia and Maryland state legislatures, made the policy decision to prohibit the execution of any defendant "with mental retardation at the time of committing first degree murder." Tenn.Code Ann. § 39–13–203(b) (2003). This statutory prohibition was followed by this Court's decision in *Van Tran v. State,* 66 S.W.3d 790 (Tenn.2001), in which we held that execution of mentally retarded persons was constitutionally prohibited as well. *Id.* at 809 (holding "execution of mentally retarded individuals fails to achieve legitimate penalogical objectives for punishment as required by the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution"). Noting that a national consensus prohibiting the execution of the mentally retarded had developed in the state legislatures over the previous decade, the United States Supreme Court adopted the same position in the year following *Van Tran. See Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (concluding that in light of "evolving standards of decency," execution of mentally retarded offenders is excessive under the Eighth Amendment).

The statute prohibiting execution of the mentally retarded provides that the burden of production and persuasion to demonstrate mental retardation is upon the defendant, who must prove his condition by a preponderance of the evidence. Tenn.Code Ann. § 39–13–203(c) (2003). If a trial court makes a pretrial determination that the defendant is not mentally retarded and the defendant is thereafter convicted of first degree murder, the de-

fendant is still permitted to offer evidence of diminished intellectual capacity as a mitigating circumstance during the sentencing phase of the capital trial under Tennessee Code Annotated section 39–13–204(j)(8). *Id.* § 39–13–203(e) (2003). If the defendant is sentenced by the jury to death, the issue may still be raised on direct appeal. *Id.* at (f).

Subsection (f) of the statute provides that "[t]he determination by the trier of fact that the defendant is *not* mentally retarded shall not be appealable by interlocutory appeal, but may be a basis of appeal by either the state or defendant following the sentencing stage of the trial." *Id.* (emphasis added). The statute does not address the propriety of interlocutory appeal where the trial court determines that a defendant *is* mentally retarded.

■ Questions of statutory interpretation are reviewed by appellate courts *de novo* with no presumption of correctness given to the courts below. *State v. Collins,* 166 S.W.3d 721, 725 (Tenn.2005) (citing *State v. Wilson,* 132 S.W.3d 340, 341 (Tenn.2004)). This Court's role when construing a statute is " 'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.' " *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn.2002) (quoting *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995)). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.' " *Osborn v. Marr,* 127 S.W.3d 737, 740 (Tenn.2004) (quoting *State v. Flemming,* 19 S.W.3d 195, 197 (Tenn.2000)). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." *Boarman v. Jaynes,* 109

S.W.3d 286, 291 (Tenn.2003) (citing *State v. Nelson,* 23 S.W.3d 270, 271 (Tenn.2000)). Under such circumstances, there is no need for recourse to the broader statutory scheme, legislative history, historical background, or other external sources of the Legislature's purpose. *Calaway ex rel. Calaway v. Schucker,* 193 S.W.3d 509, 516 (Tenn.2005) (citing *In re Conservatorship of Clayton,* 914 S.W.2d 84, 90 (Tenn.Ct. App.1995)).

Notably, the plain language of the statute, while prohibiting interlocutory appeals from a trial court's determination that a defendant is *not* mentally retarded, does not prohibit interlocutory appeals from a trial court's determination that a defendant *is* mentally retarded. We apply the statutory construction canon *expressio unius est exclusio alterius* ("to mention one thing is to exclude others") to conclude that the legislature did not intend to prevent interlocutory appeals in cases where the trial court finds that the defendant is mentally retarded. *See Calaway,* 193 S.W.3d at 516–17.

The next question is whether the issue in this case meets the criteria for interlocutory review under Tennessee Rule of Appellate Procedure 9 which governs interlocutory appeals by permission. The language of Rule 9 provides for the consideration of the following criteria when determining whether to grant interlocutory appeal:

> (1) the need to prevent irreparable injury, giving consideration to the severity of the potential injury, the probability of its occurrence, and the probability that review upon entry of final judgment will be ineffective;

> (2) the need to prevent needless, expensive, and protracted litigation, giving consideration to whether the challenged order would be a basis for reversal upon entry of a final judgment, the probability of reversal, and whether an interlocutory appeal will result in a net reduction in the duration and expense of the litigation if the challenged order is reversed; and (3) the need to develop a uniform body of law, giving consideration to the existence of inconsistent orders of other courts and whether the question presented by the challenged order will not otherwise be reviewable upon entry of final judgment.

Tenn. R.App. P. 9(a). As applied to criminal actions, the Rule specifically provides that "[p]ermission to appeal under this rule may be sought by the state and defendant in criminal actions." Tenn. R.App. P. 9(g).

As a practical matter, the effect of a trial court's finding that a defendant is mentally retarded is that the State loses the option to pursue the death penalty. Once a defendant is tried and judgment is entered, the State has no appeal as of right under the Tennessee Rules of Appellate Procedure. *See* Tenn. R.App. P. 3(c) (providing for State's appeal as of right in limited circumstances, not including a trial court's finding that a defendant is mentally retarded). Furthermore, even if a defendant were to appeal on other grounds and successfully obtain a retrial, the State would arguably be barred by principles of double jeopardy from seeking the death penalty in subsequent sentencing proceedings. *See Arizona v. Rumsey,* 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984) (holding that if a trial court has rejected death as a possible sentence, double jeopardy bars the state from seeking the death penalty at re-sentencing, even where rejection of the death sentence was based on a legal error).[8]

---

**8.** *But see Sattazahn v. Pennsylvania,* 537 U.S. 101, 107, 123 S.Ct. 732, 154 L.Ed.2d 588

Accordingly, denying the State an interlocutory appeal when a trial court precludes the death penalty by finding a defendant mentally retarded leaves no appellate recourse at all. We conclude that the question raised in this case is one appropriately raised under Rule 9(a)(1). *Cf. People v. Super. Ct.*, 40 Cal.4th 999, 56 Cal.Rptr.3d 851, 155 P.3d 259, 264–65 (Cal.2007) (holding that although the California Legislature did not expressly provide for appeal from a trial court's determination that a defendant was mentally retarded, allowing such an appeal was consistent with California Penal Code section 1238 which provides for interlocutory review of orders or judgments dismissing or otherwise terminating all or any portion of the action). The Court of Criminal Appeals' conclusion that this matter was appropriate for interlocutory appeal under Tennessee Rule of Appellate Procedure 9 is affirmed.

### *Meaning of "Developmental Period"*

■ As noted above, Tennessee Code Annotated section 39–13–203(a)(3) requires that mental retardation (a sub–71 I.Q. and deficits in adaptive behavior) be "manifested during the developmental period, or by eighteen (18) years of age." The trial court construed the language of the statute as providing two time frames during which the mental retardation may manifest: *either* during the "developmental period" *or* by age eighteen. Because the phrase "developmental period" is not defined within the statute, the trial court based its interpretation on the testimony of the Defendant's mental health expert, Dr. Brown, who defined the developmental period as extending "from birth up through roughly ... between ages 24 to 26." Under that

definition, the trial court found that the third prong of the statute had been satisfied.

■ On appeal, the State argued that the phrase "or by eighteen (18) years of age" modified the preceding phrase, "the developmental period." The Court of Criminal Appeals, after performing an exhaustive analysis of the language of the statute, judicial precedent, and legislative history, concluded that the phrase "developmental period" was limited by the phrase "by eighteen (18) years of age." Accordingly, for a defendant to meet the third prong of section 39–13–203(a), the mental retardation must have manifested no later than the age of eighteen. This question is one of statutory interpretation, purely a question of law, which we review *de novo. Collins*, 166 S.W.3d at 725.

■ As previously noted, when construing a statute we attempt " 'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.' " *Houghton*, 90 S.W.3d at 678 (citation omitted). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.' " *Osborn*, 127 S.W.3d at 740 (citation omitted). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." *Boarman*, 109 S.W.3d at 291. This Court presumes that the General Assembly used each word in a statute deliberately, and that the use of each word conveys a specific purpose and meaning. *State v. Jennings*, 130 S.W.3d 43, 46 (Tenn.2004) (citing *Bryant v. Genco Stamping & Mfg. Co.*,

(2003) (noting that " 'acquittal' at a trial-like sentencing phase, rather than mere imposi-

tion of a life sentence, is required to give rise to double jeopardy protections").

33 S.W.3d 761, 765 (Tenn.2000); *Crowe v. Ferguson*, 814 S.W.2d 721, 723 (Tenn. 1991)). Accordingly, we "must give effect to every word, phrase, clause, and sentence in constructing a statute." *Id.* (quoting *Cohen v. Cohen*, 937 S.W.2d 823, 828 (Tenn.1996)). If, however, the plain language of a statute is ambiguous, the Court will look beyond the statutory language to determine the legislature's intent. *Id.* (citing *Perrin v. Gaylord Entm't Co.*, 120 S.W.3d 823, 826 (Tenn.2003), and *Lavin v. Jordon*, 16 S.W.3d 362, 366 (Tenn.2000)).

In this case, we concede that the language of the statute is arguably ambiguous and susceptible of two interpretations. On the one hand, the use of the connecting word "or" suggests a disjunctive intent that the phrase "developmental period" encompasses a time frame different from the phrase "by eighteen (18) years of age." This is the interpretation adopted by the trial court.[9] On the other hand, the General Assembly's use of a comma before the word "or" can also suggest that the phrase "by eighteen (18) years of age" is intended to explain "developmental period." This is the interpretation adopted by the Court of Criminal Appeals. Either interpretation is reasonable.

Because of this ambiguity, it is necessary to look beyond the words used in the statute to the legislative history of the statute. *See Jennings*, 130 S.W.3d at 46. The recordings of the legislative debates on the proposed bill indicate that including a limitation on the definition of mental retardation that required it to be manifested before the age of eighteen was discussed and thoroughly considered by members of the various subcommittees and the General Assembly.

At House Judiciary Committee hearings, the bill sponsor represented the definition of mental retardation as "the standard definition of mental retardation recognized by the American Association on Mental Retardation." Tenn. House Jud. Comm., *Debate on House Bill 2107*, March 13, 1990. The definition conveyed to the Committee at that time "require[d] that it be diagnosed during the developmental period under eighteen years of age." *Id.* There was specific discussion regarding the reason for requiring diagnosis before age eighteen. As explained by the sponsor at that time, ninety-nine percent of the mentally retarded population was diagnosed before eighteen years of age. He stated, "This is a defect that you are born with and this would certainly cover most instances." When addressing concerns by one member of the Committee concerning older defendants who might never have received formal diagnosis, the sponsor acknowledged that the proposed legislation would not cover every conceivable situation, but that the age-limiting provision was part of a compromise.

At a Senate Judiciary Committee meeting later that same day, Roger Blue, an expert in mental retardation, testified:

> The definition as spelled out in this legislation is the accepted definition of the American Association on Mental Retardation, which is a universally accepted definition used in the field. The sub-

---

**9.** In reaching this interpretation, the trial court looked to the definition of mental retardation contained in Tennessee Code Annotated section 33–1–101(17)(B), which provides that in order to qualify for benefits due to a mental health or developmental disability, mental retardation must be "manifested before eighteen (18) years of age." The trial court reasoned that since this definition was in effect at the time section 39–13–203 was enacted, the General Assembly would have been aware of such definition and must have intended to give trial courts an alternative for the diagnosis period beyond the age of eighteen when determining eligibility for capital sentencing.

stantial subaverage intelligence is one of three things that have to exist for someone to be considered to have mental retardation as opposed to other types of handicaps. The reference to subaverage intelligence, the general level I.Q. used in testing ... generally the I.Q. of 70 and below is considered to be substantially subaverage intelligence. It also has to be accompanied by a deficit in adaptive behavior. It also has to have occurred during the developmental years, which means you are either born with it or in early childhood develop it. Tenn. Senate Jud. Comm., *Debate on Senate Bill 1851*, March 13, 1990. Mr. Blue explained that "by the time a person will have reached the age of eighteen, there should be a paper trail or a diagnosis or some evaluation already there." *Id.*

Later debates during the House Session included additional discussion about the provision requiring diagnosis or manifestation before the age of eighteen. *See* Tenn. House Session, *Debate on House Bill 2107*, April 5, 1990. The bill sponsor reiterated that the provision requiring that mental retardation be established prior to the eighteenth birthday was a point of compromise. *Id.* He emphasized that under the language of the bill, mental retardation had to be diagnosed before the eighteenth birthday. A defendant suffering from a defect or impairment occurring after the eighteenth birthday would not fall under the language of the bill. *Id.* He conceded that the legislation would not address all scenarios, but was limited to mental retardation as it existed from birth. *Id.*

Similar discussion occurred during the Senate Session. The Senate sponsor referred to the critical time as "the developmental period, ... which is to say by the age of eighteen." Tenn. Senate Session, *Debate on House Bill 2107*, April 12, 1990. Several hypothetical fact scenarios were

raised regarding situations involving older defendants who might not have I.Q. test results predating the age of eighteen. *Id.* The bill sponsor clarified that even in a situation where there was no I.Q. test, if a defendant presented evidence of a current I.Q. of 70 or below and could present expert testimony that he was operating or functioning at that same level before age eighteen, then he could meet the criteria under the statute. *Id.*

Based on the legislative history it is clear that the Legislature did not intend for the term "developmental period" to extend beyond eighteen years of age.

Furthermore, while the issue concerning "alternative" definitions of "developmental period" has never been expressly raised in this Court, previous analysis of Tennessee Code Annotated section 39–13–203 indicates that the Court has consistently considered the definition of mental retardation to require manifestation of the condition prior to the age of eighteen. In *Van Tran*, we analyzed the statute in the context of deciding whether execution of the mentally retarded violated the state and federal constitutional provisions against cruel and unusual punishment. 66 S.W.3d at 797–99. Within the analysis of the definition of "mental retardation," the Court cited to the definition included in the DSM IV, which, like the statutory definition, requires that the intellectual and adaptive deficits manifest themselves by the time the person is eighteen years of age. *Id.* at 795.

More recently, we analyzed the definition of mental retardation in *Howell v. State*, 151 S.W.3d 450 (Tenn.2004). Acknowledging that the condition of mental retardation was difficult to define accurately, we nevertheless cited with approval the definition accepted by the American Association on Mental Retardation and the American Psychiatric Association and ap-

proved by the United States Supreme Court in *Atkins:*

> At present ... the most widely recognized definitions of mental retardation include two basic characteristics: significantly subaverage intellectual functioning accompanied by related limitations in two or more adaptive skill areas (such as self-care, communication, or social skills), *and manifestation of the condition before age 18.*

*Howell,* 151 S.W.3d at 457 (emphasis added) (citing to *Atkins,* 536 U.S. at 308 n. 3, 122 S.Ct. 2242). Part of this Court's analysis included a comparison of the definition in Tennessee Code Annotated section 39–13–203(a) to that in Tennessee Code Annotated section 33–1–107(17), the statute defining mental retardation in the context of eligibility for social services. *Howell,* 151 S.W.3d at 458. Section 33–1–107(17) provides:

> "Mental retardation" means substantial limitations in functioning:
>
> (A) As shown by significantly sub-average intellectual functioning that exists concurrently with related limitations in two (2) or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work; and
>
> (B) That are manifested before eighteen (18) years of age.

Tenn.Code Ann. § 33–1–107(17) (Supp. 2003). Noting the lack of reference to a particular numerical I.Q. score in the latter provision, and the fact that the latter provision was in existence at the time the General Assembly adopted section 39–13–203(a), we concluded that the definition in section 39–13–203(a) was intended to apply a *more restrictive* standard to defendants in capital prosecutions. *Howell,* 151 S.W.3d at 458. The Defendant's argument that the word "or" should be applied in the disjunctive sense to give alternative interpretations of "developmental period," as opposed to in the restrictive sense to limit the outer bounds of "developmental period" to age eighteen, is inconsistent with our conclusion in *Howell* that the criminal statute was intended to be more restrictive.

We have also considered statutes and case law in other jurisdictions that have addressed the definition of mental retardation in the context of death penalty cases. There are a few jurisdictions that have not expressly defined "developmental period" at all. *See* Colo.Rev.Stat. Ann. § 18–1.3–1101(2) (West, Westlaw through July 1, 2007) (requiring only that the condition be manifested and documented during "the developmental period," without defining that term); Ga.Code Ann. § 17–7–131(a)(3) (West, Westlaw through 2006 Sess.) (requiring only that the condition be manifested during "the developmental period," without defining that term); Neb.Rev.Stat. § 28–105.01(3) (Westlaw through 2006 Sess.) (containing no limit on the age or time period during which the condition must be diagnosed); Nev.Rev.Stat. Ann. § 174.098.7 (West, Westlaw through 2005 Sess.) (requiring only that the condition be manifested during "the developmental period," without defining that term); N.M. Stat. Ann. § 31–20A–2.1 (West, Westlaw through June 28, 2007 Spec. Sess.) (containing no limit on the age or time period during which the condition must be diagnosed); *Franklin v. Maynard,* 356 S.C. 276, 588 S.E.2d 604, 605 (S.C.2003) (adopting the definition of mental retardation contained within the statute making it a mitigating circumstance, S.C.Code Ann. § 16–3–20(C)(b)(10) (2003), which requires manifestation during "the developmental period," but does not define that term).

Three states define the developmental

period as extending to age twenty-two.[10] *See* Ind.Code Ann. § 35–36–9–2 (West, Westlaw through 2007 Sess.) (providing that the condition manifest before the age of twenty-two); Md.Code Ann., Crim. Law § 2–202(b)(1) (West, Westlaw through 2007 Sess.) (providing that the age of onset is before the age of twenty-two); Utah Code Ann. § 77–15a–102 (West, Westlaw through 2006 legislation) (providing that the condition manifest prior to age twenty-two).

The majority of jurisdictions, however, either expressly by statute or by interpretation through case law, define "mental retardation" as a condition that manifests before the age of eighteen, in accord with our decision today. *See* Ariz.Rev.Stat. Ann. § 13–703.02(K)(3) (Westlaw through 2007 legislation) (providing that the onset *of the condition occur before the defendant* reached the age of eighteen); Ark.Code Ann. § 5–4–618(a)(1) (West, Westlaw through 2006 legislation) (providing that the condition manifest in the developmental period, but no later than eighteen years of age); Cal.Penal Code § 1376(a) (West, Westlaw through 2007 Sess.) (providing that the condition manifest before the age of eighteen); Conn. Gen.Stat. Ann. § 1–1g(b) (West, Westlaw through 2007 Sess.) (defining "developmental period" as the period of time between birth and the eighteenth birthday); 11 Del.Code Ann. § 4209(d)(3) (Westlaw through 2007 laws) (providing that the condition manifest before the individual became eighteen years of age); Fla. Stat. Ann. § 921.137(1) (West, Westlaw through June 26, 2007) (providing that the condition be manifested during the period from conception to age eighteen); Idaho Code Ann. § 19–

2515A(1)(a) (Westlaw through 2007 Sess.) (providing that the onset of the condition must occur before age eighteen); 725 Ill. Comp. Stat. Ann. 5/114–15(d) (West, Westlaw through 2007 Sess.) (providing that the condition must have manifested by the age of eighteen); Kan. Stat. Ann. §§ 21–4623(e) & 76–12b01 (Westlaw through 2006 Sess.) (providing that the age of onset of the condition must be prior to eighteen years old); La.Code Crim. Proc. Ann. art. 905.5.1(H)(1) (Westlaw through 2006 Sess.) (providing that the onset must occur before the age of eighteen); Mo. Ann. Stat. § 565.030.6 (West, Westlaw through June 26, 2007) (providing that the condition is manifested and documented before eighteen years of age); N.Y.Crim. Proc. Law § 400.27(12)(e) (McKinney, Westlaw through 2007 legislation) (providing that the condition was manifested before the age of eighteen); N.C. Gen.Stat. Ann. § 15A–2005(a)(1)(a) (West, Westlaw through 2007 Sess.) (providing that the condition manifest before the age of eighteen); 21 Okla. Stat. Ann. § 701.10b(B) (Westlaw through 2007 Sess.) (providing that the condition be manifested before the age of eighteen); S.D. Codified Laws § 23A–27A–26.1–.2 (Westlaw through 2007 Sess.) (providing that the condition must have been manifested and documented before the age of eighteen); Va.Code Ann. § 19.2–264.3:1.1 (West, Westlaw through 2007 Sess.) (defining the condition as originating before the age of eighteen); Wash. Rev.Code Ann. § 10.95.030(2)(a), (e) (West, Westlaw through 2007 legislation) (defining the "developmental period" as the "period of time between conception and the eighteenth birthday"). *See also United*

---

10. The Code of Federal Regulations defines mental retardation for purposes of obtaining disability benefits as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." The "developmental period" in this context is also defined as "onset of the impairment before age 22." 20 C.F.R. pt. 404 subpt. P, app. 12.05 (Westlaw through June 25, 2007).

States v. Nelson, 419 F.Supp.2d 891, 894–95 (E.D.La.2006) (adopting the AAMR and DSM IV definitions of mental retardation, which require onset before the age of eighteen); United States v. Cisneros, 385 F.Supp.2d 567, 570 (E.D.Va.2005) (adopting the AAMR and Virginia Code definitions of mental retardation, which require onset before the age of eighteen); Ex parte Perkins, 851 So.2d 453, 456 (Ala. 2002) (defining "developmental period" as before the age of eighteen); Bowling v. Commonwealth, 163 S.W.3d 361, 368 (Ky. 2005) (implicitly adopting the AAMR and American Psychiatric Association requirement, approved in Atkins, that the age of onset must be before the age of eighteen); Lynch v. State, 951 So.2d 549, 556 (Miss. 2007) (accepting the AAMR definition that requires the condition manifest before the age of eighteen); State v. Lott, 97 Ohio St.3d 303, 779 N.E.2d 1011, 1014 (2002) (adopting the clinical definitions for mental retardation cited by the United States Supreme Court in Atkins, i.e., requiring onset before the age of eighteen); Commonwealth v. Miller, 585 Pa. 144, 888 A.2d 624, 630 n. 7 (Pa.2005) (requiring onset of the condition before the age of eighteen); Ex parte Briseno, 135 S.W.3d 1, 7–8 (Tex. Crim.App.2004) (adopting the AAMR definition that requires onset of the condition occur prior to the age of eighteen).

Based on an exhaustive review of the legislative history of the statute, this Court's prior understanding of the terms, and a survey of other jurisdictions, we conclude that the language "during the developmental period, or by the age of eighteen" does not include the years past the age of eighteen. Under the definition of "mental retardation" as set forth in Tennessee Code Annotated section 39–13–

203(a), both the significantly subaverage general intellectual functioning (as evidenced by I.Q. scores of 70 or below) and deficits in adaptive behavior must be manifested by the age of eighteen.

### ·Proof of Subaverage General Intellectual Functioning Prior to Age Eighteen

■ After hearing the proof submitted by the Defendant and the State, which consisted of expert psychological testimony and the testimony of the Defendant's adoptive mother, the trial court concluded that (1) the Defendant had an I.Q. of 70 or below prior to his eighteenth birthday and (2) the Defendant suffered deficits in adaptive behavior prior to his eighteenth birthday.[11] Based on those findings, the court concluded that the Defendant was mentally retarded under the definition contained within Tennessee Code Annotated section 39–13–203(a). As noted above, the question of whether an individual is mentally retarded for purposes of eligibility of the death penalty is a mixed question of law and fact. On appeal the trial court's findings of fact must be reviewed with a presumption of correctness and reversed only when the preponderance of the evidence is contrary to the findings of the court. Odom, 928 S.W.2d at 23.

The Court of Criminal Appeals determined that the evidence preponderated against the trial court's findings—both as to the proof of below 70 I.Q. and proof of deficits in adaptive behavior. We agree.

The proof in the record is that although the Defendant had his I.Q. tested at least four times before reaching the age of eighteen, he never scored 70 or below on any of those occasions. In 1990, at age eight,

11. These findings were alternative to the trial court's preliminary finding that the Defendant's significantly subaverage general intellectual functioning (as evidenced by an I.Q. score of 69 at the age of twenty-three), and his deficits in adaptive behavior occurred during the "developmental period," which the court defined as up to age twenty-four.

he scored an 88; in 1992, at age eleven, he scored a 75; in 1995, at age thirteen, he scored a 78; and in 1996, at age fifteen, he again scored a 78. In addition, after being admitted to the Tennessee Department of Correction in 2003, at age twenty-one or twenty-two, he scored an 84. It was not until 2004, at the age of twenty-three, that he scored below a 70. Both the expert for the Defendant and the expert for the State agreed that he scored a 69 on this last test, which met the definition of "significantly subaverage general intellectual functioning" under Tennessee Code Annotated section 39–13–203(a)(1).

This crime was committed in 2001, when the Defendant was twenty years old. Defense expert Dr. Brown conceded that there were no records reflecting an I.Q. score of 70 or less prior to the age of eighteen. Furthermore, he admitted that he could not project the I.Q. score of 69, received at age twenty-three, back to the time of the crime, when the Defendant was twenty years old. State expert Dr. Engum agreed with Dr. Brown that no previous evaluation of the Defendant showed that he had an I.Q. lower than 70. Every psychological evaluation conducted previously had indicated that the Defendant was in the "borderline range," but was not mentally retarded. The trial court's statement that "Dr. Brown further testified Defendant would have had the same I.Q. of 69 at age 20" is inaccurate. Dr. Brown did testify that "[t]o my satisfaction, the problem we have today he had when he was in kindergarten." This statement, however, was in the context of a discussion on the Defendant's deficits in adaptive behavior, which Dr. Brown gleaned from his discussions with the Defendant's adoptive mother and from notations in the Defendant's educational files. Dr. Brown expressly conceded at several points during his testimony that the Defendant's mental retardation did not manifest itself in any records

prior to the age of eighteen. He opined, however, that the Defendant's mental retardation manifested during the developmental period, which he defined as up to the age of twenty-four or twenty-six years old. We have rejected such a definition. Based on uncontroverted evidence, the trial court's finding that the Defendant was mentally retarded at the time of the crime is not supported by a preponderance of the evidence. The Court of Criminal Appeals' decision on this point is affirmed.

### Proof of Deficits in Adaptive Behavior Prior to Age Eighteen

■ As noted above, the trial court also found that the Defendant had exhibited deficits in adaptive behavior prior to the age of eighteen. The Court of Criminal Appeals concluded that the evidence preponderated against the trial court's findings on this point as well.

Granted, the evidence on this issue was controverted. Dr. Brown relied heavily on information provided by the Defendant's adoptive mother and on a report from Youth Villages when the Defendant was nineteen years old to conclude that he had a significant deficit in adaptive functioning prior to the age of eighteen. Dr. Engum, on the other hand, cited the Defendant's ability to pass his driver's license test, operate a motor vehicle, hold a job, establish a residential living situation, and babysit a child as evidence that he was able to adapt to his environment and function "at some level." Dr. Engum attributed the Defendant's problems to a variety of emotional, behavioral, motivational, and environmental problems, and potentially problems related to Attention Deficit Hyperactivity Disorder with a learning disability. He did not believe the evidence supported a finding of mental retardation prior to the age of eighteen. Nonetheless, if the trial court accredited the testimony of Dr.

Brown over that of Dr. Engum, as was its prerogative, it could reasonably conclude that the evidence supported finding deficits in adaptive behavior prior to the age of eighteen.

However, given that Tennessee Code Annotated section 39–13–203(a) requires the manifestation of *both* significantly subaverage general intellectual functioning as evidenced by a functional I.Q. of 70 or below *and* deficits in behavior before the age of eighteen, and given that we have affirmed the Court of Criminal Appeals' decision that the proof preponderated against the trial court's finding that the Defendant had an I.Q. of 70 or below prior to the age of eighteen, the question of whether there was proof of deficits in adaptive behavior is moot. We find it unnecessary to address this aspect of the issue.

### CONCLUSION

We conclude that (1) an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure is available to the State under Tennessee Code Annotated section 39–13–203(f) when the trial court determines that a defendant *is* mentally retarded; and (2) the evidence preponderates against the trial court's finding that the Defendant manifested significantly subaverage general intellectual functioning (as evidenced by a functional I.Q. of 70 or below) prior to the age of eighteen, and was therefore mentally retarded under the definition contained within Tennessee Code Annotated section 39–13–203(a). The judgment of the Court of Criminal Appeals is affirmed. It appearing that the Defendant is indigent, the costs of this appeal are taxed to the State of Tennessee.