# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 7, 2010 Session

## MICHAEL WAYNE HOWELL v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-14334     W. Otis Higgs, Jr., Judge**

---

**No. W2009-02426-CCA-R3-PD  - Filed June 14, 2011**

---

Petitioner, Michael Wayne Howell, was convicted of felony murder and sentenced to death. Petitioner's conviction and sentence were affirmed on direct appeal. See State v. Howell, 868 S.W.2d 238 (Tenn. 1993).  After his petition for post-conviction relief was denied, Petitioner sought to reopen post-conviction relief proceedings maintaining that he was mentally retarded (hereinafter "intellectually disabled" or "having intellectual disability" or other proper designation in light of statutory amendments in 2010) and thus ineligible to be sentenced to death.  Following an evidentiary hearing, the post-conviction court denied Petitioner relief, and Petitioner appealed.  Following a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLLIAMS and ALAN E. GLENN, JJ., joined.

Amy Dawn Harwell, Kelley Henry, and Paul Bottei, Nashville, Tennessee, for the appellant, Michael Wayne Howell.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory and James Gaylord, Assistant Attorneys General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

Susan L. Kay, Nashville, Tennessee, and Lawrence J. Fox, Philadelphia, Pennsylvania, for the Amicus Curiae, Professors and Practitioners of Legal Ethics and Professional Responsibility.

## OPINION

### FACTUAL BACKGROUND OF CAPITAL CASE

The facts which led to Petitioner's conviction of first degree felony murder and the imposition of the death penalty are set forth in State v. Howell, 868 S.W.2d 238 (Tenn. 1993). In summary, Petitioner and his girlfriend, Mona Lisa Watson, embarked upon a crime spree that lasted approximately one month, occurred in three states, and resulted in two first degree murder convictions and two death sentences for Petitioner, as well as an additional conviction for attempted murder. The facts reflect that there was also a theft of a vehicle in Shelby County, as well as robberies in conjunction with the murders. Howell, 868 S.W.2d at 244-46. In chronological order, Petitioner stole a pickup truck from his former employer in Memphis; murdered a Memphis convenience store clerk by shooting him with a Smith and Wesson .38 caliber handgun at close range in the forehead during a robbery which netted $111.16; drove the truck to Oklahoma where he shot and killed Charlene Calhoun with the same handgun in the parking lot of her apartment complex at the time of stealing her Toyota vehicle and burning the stolen pickup truck in the same parking lot; returned to Memphis and then traveled to Florida where he and his girlfriend were finally arrested almost one month later in Panama City after a shoot-out with law enforcement officers. Id. at 244-45. All of the events described occurred between October 31, 1987, and November 29, 1987, with the murder of the store clerk in Memphis committed on the night of November 1 and 2, and the murder in Oklahoma committed at approximately 9:00 p.m. on November 2. Id.

### POST-CONVICTION PROCEEDINGS

Following the affirmance of the murder conviction and death sentence, Petitioner filed a petition for post-conviction relief. The post-conviction court dismissed the petition, and this Court affirmed. See Michael Wayne Howell v. State, No. 02C01-9706-CR-00200, 1997 WL 746438 (Tenn. Crim. App., at Jackson, Dec. 3, 1997) perm. to appeal denied (Tenn. June 8, 1998). On appeal, Petitioner argued that he had received ineffective assistance of counsel at his trial, and that he was unconstitutionally denied his right to present mitigating evidence when the original trial court would not allow him to introduce evidence of a recantation of testimony by his co-defendant. Id. at *1. Our Court concluded that the recantation issue was previously determined in the direct appeal of the conviction. Id. at **10-11. The assertions of ineffective assistance of counsel centered upon Petitioner's argument that trial counsel should have presented an insanity defense and used a more effective method to introduce evidence of the co-defendant's recantation. Id. at **8-9.

On December 3, 2002, Petitioner filed a motion to reopen his petition for post-conviction relief, which is the subject of the present appeal. Petitioner argues that he is intellectually disabled and therefore constitutionally ineligible to be executed by the State. The post-conviction court initially denied the motion without an evidentiary hearing, finding that Petitioner failed to make a prima facie showing of intellectual disability. Our Court affirmed the denial. However, our Supreme Court reversed, specifically holding that,

> under the specific facts of this case, in which a petitioner is able, for the first time in his motion to reopen his petition for post-conviction relief, to claim ineligibility for the death penalty due to [intellectual disability] under [Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001)] or [Atkins v. Virginia, 536 U.S. 304 (2002)], the motion should be considered under the "colorable claim" evidentiary standard rather than the "clear and convincing" standard. We also hold that Tennessee Code Annotated section 39-13-203(a) (2003) clearly and unambiguously requires the defendant to have an I.Q. of seventy or below to be considered [intellectually disabled]. We conclude that the petitioner's motion to reopen his post-conviction hearing set out a colorable claim, thus entitling him to an evidentiary hearing, without a jury, on the issue of [intellectual disability].

Howell v. State, 151 S.W.3d 450, 452-53 (Tenn. 2004).

## EVIDENTIARY HEARING

During the evidentiary hearing on remand, the Petitioner presented the testimony of Dr. George Woods, Jr., Dr. Daniel Grant, Dr. Stephen Greenspan, and Dr. James Flynn. The State presented the testimony of Dr. John Hutson.

### Petitioner's Proof

Dr. George Woods, Jr. is a physician who specializes in neuropsychiatry. At the time of the hearing, Dr. Woods had a clinical practice in Oakland, California. The post-conviction court declared Dr. Woods as an expert witness in both neuropsychiatry and intellectual disability. In January 2009, one of Petitioner's attorneys asked Dr. Woods "to review a number of materials that related to [Petitioner's] mental state and past criminal history, et cetera. And also to evaluate [Petitioner]."

While Dr. Woods examined voluminous records, he did not prepare his own report. He did prepare a Power Point presentation which was made an exhibit to his testimony. At

the outset of his testimony, Dr. Woods made it clear that in his opinion there is only one acceptable protocol for assessing whether a person is intellectually disabled. He stated,

> Well there's really only one protocol that has been accepted, Ms. Harwell [Petitioner's co-counsel]. And that, <u>even regardless of the statutory requirement or the clinical requirements.</u> And that is, the protocol of number one and that's the protocol of the [American Association of Intellectual and Developmental Disabilities (AAIDD)], which is very similar to the protocol of the American Psychiatric Association.

(Emphasis added.)

Dr. Woods clarified that the AAIDD is the same association formerly known as the American Association of Mental Retardation (AAMR). He also acknowledged on cross-examination that Tennessee statutory and case law on the definition of intellectual disability "does not completely track the [AAIDD] definition." While acknowledging that he was fully aware of the Tennessee statutory definition of intellectual disability in his assessment of Petitioner, he admitted that the AAIDD definition differed from the Tennessee statutory definition in one particular part. The Tennessee statute requires a showing of a functional I.Q. of 70 or below to be found intellectually disabled. Dr. Woods testified that the AAIDD definition "that's used in almost every other clinical situation talks about a <u>range of IQ around 70</u>." (Emphasis added.)

Dr. Woods testified about what he considered to be a public misconception of intellectual disability. For instance, Dr. Woods stated that a person who is intellectually disabled does not have to be incompetent, illiterate, unable to hold a job, or unable to have a meaningful conversation. He, in fact, testified that intellectual disability "looks like a 10 or 11 year old child."

Dr. Woods did not administer an I.Q. test to Petitioner, but did review the results of I.Q. tests administered to Petitioner by others. He described generally that the proper protocol requires the use of a proper I.Q. test and the examination of the individual's adaptive functioning. In order to assess whether Petitioner is intellectually disabled, Dr. Woods examined "a variety of records." These records included the following: family history, Petitioner's medical history, birth certificates and medical records of Petitioner's siblings, medical records of Petitioner's parents, birth and death certificates of Petitioner's parents, Petitioner's birth certificate, school records of Petitioner and his siblings, and Petitioner's prison records. He also reviewed transcripts of testimony of Petitioner's mother, Petitioner, and five of Petitioner's siblings at Petitioner's sentencing hearing in Oklahoma and Tennessee. Dr. Woods also reviewed the reports of other expert witnesses, including

Dr. Stephen Greenspan, Dr. Daniel Grant, and Dr. James R. Flynn. He reviewed affidavits from Petitioner's family members, teachers, and "employers or almost employers." Dr. Woods also interviewed Petitioner.

As already noted, Dr. Woods used the AAIDD definition to reach his opinion that Petitioner meets the criteria for being intellectually disabled. Dr. Woods testified that he reviewed the various testing and "the testing, when scored accurately, is consistent with these scores that are required for [intellectual disability]." Dr. Woods opined that the most accurately scored test was the Wechsler Adult Intelligence Scale-III (WAIS-III) performed by Dr. Grant. Dr. Woods stated that the results of the test, after they were adjusted under the Flynn Effect, was a score of 71. Dr. Woods admitted that the AAIDD manual states that the Flynn Effect "still needs to be looked at and you don't necessarily need to apply it." Dr. Woods opined that Petitioner's I.Q. was between 63 and 71. He acknowledged that Dr. Flynn had opined in his report that Petitioner's I.Q. was between 56 and 81 but stated that Dr. Flynn included the standard error of measurement in his range.

Dr. Woods testified on cross-examination that Petitioner was never diagnosed as intellectually disabled until 2002 when Petitioner was approximately forty-two years old. This diagnosis was approximately fifteen years after the commission of the crime for which Petitioner was convicted, and approximately nine years after the Tennessee Supreme Court affirmed on direct appeal the conviction of first degree felony murder and the sentence of death. See State v. Howell, 868 S.W.2d 238 (Tenn. 1993).

In reviewing the various records, Dr. Woods noted that Petitioner grew up in poverty. He and his family moved regularly due to the lack of money, and his father was an alcoholic who abused his mother. Petitioner and his siblings were malnourished. Petitioner also had a history of head injuries. When Petitioner was seventeen years old, one of his brothers hit him in the head with an automobile jack causing him to lose consciousness. Petitioner also had a history of headaches prior to turning eighteen years old. Prior to the age of eighteen, Petitioner began inhaling glue. Dr. Woods testified that these factors "can" be reflective of brain development. According to Dr. Woods, drug abuse "can" exacerbate mental retardation.

Dr. Woods noted that Petitioner failed in elementary school and failed the ninth grade twice. Petitioner then dropped out of school after attempting the ninth grade for the third time. Petitioner was socially promoted rather than academically promoted to the sixth grade. His grades consisted primarily of Ds and Fs with some Cs in school. Dr. Woods opined that Petitioner is "someone who has the kind of academic impairments that are consistent with an impaired IQ." Dr. Woods also considered the fact that Petitioner did not have a driver's

license but noted that it did not stop Petitioner from driving. Dr. Woods maintained that past criminal behavior or verbal behavior should not be used to infer a level of adaptive behavior.

Dr. Woods opined that Petitioner meets the criteria for intellectual disability and that such disability arose during the developmental period. Dr. Woods testified that he based his opinion regarding the developmental period on Petitioner's grades in school. Dr. Woods noted that during Petitioner's early academic career, federal law regarding special education had not been enacted. Following the enactment of the law, "one of his siblings after him" was placed in special education. Dr. Woods testified that in order to be placed in special education, the child would need to be determined to be intellectually disabled. Gail Bridges, Petitioner's former teacher, stated in an affidavit that she taught him in special education classes. However, Petitioner's actual school records do not reflect that Petitioner was in special education. Dr. Woods noted other reasons that a student may be socially promoted other than intellectual disability, including being "a bad student, a person who doesn't care, doesn't try things."

Dr. Daniel Grant is a psychologist with a small private practice in psychology and neuropsychology in Georgia and oversees mental health operations in two juvenile detention facilities in Georgia. The post-conviction court declared Dr. Grant as an expert witness in both neuropsychiatry and intellectual disability. Dr. Grant was approached by Petitioner's investigative team in 2002 to conduct an assessment of Petitioner to determine whether he is intellectually disabled.

Dr. Grant testified that the AAIDD sets the "national standard" for determining intellectual disability. Dr. Grant defined intellectual disability as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social and practical skills and this disability originates before age 18." Dr. Grant also referred to the DSM-IV-TR, a book published by the American Psychiatric Association (APA), as the standard for the diagnosis of mental disorders. Dr. Grant explained that there are three parts of the definition of intellectual disability: "low intelligence, deficits in adaptive behavior and manifested during the developmental period."

Dr. Grant stated that intelligence is best measured by I.Q. scores and that "[t]he criteria for diagnosis is appropriately two standard deviations below the mean considering the standard error of measurement for the specific assessment instrument used and the instrument strengths and limitations." According to Dr. Grant, the test administered should be an individually comprehensive assessment, and group administered tests should be avoided.

Dr. Grant testified that the AAIDD recognizes the Flynn Effect, which provides that a full-scale I.Q. increases approximately .33 points for every year elapsed since the test was normed. According to Dr. Grant, under the Flynn Effect, a full-scale I.Q. score of 73 should be considered as the cut-off score for intellectual disability utilizing the WAIS-III test.

Dr. Grant administered three intelligence tests to Petitioner in 2002: the WAIS-III, the Stanford-Binet fourth edition, and the Comprehensive Test in Nonverbal Intelligence (C-TONI). Petitioner received a full-scale score of 73 on the WAIS-III, test composite score of 62 on the Stanford-Binet, and a non-verbal score of 67 on the CTONI. Dr. Grant administered three intelligence tests to Petitioner in 2002: the WAIS-III, the Stanford-Binet fourth edition, and the Comprehensive Test of Non-Verbal Intelligence (CTONI). Petitioner received a full-scale score of 73 on the WAIS-III, test composite score of 62 on the Stanford-Binet, and a non-verbal score of 67 on the CTONI. Dr. Grant stated that he considered the Flynn Effect when he conducted his evaluation of Petitioner but did not reduce the scores in the affidavit that he prepared as a result of his evaluation. He has since received a report from Dr. Flynn reflecting the scores when the Flynn Effect is applied. When the Flynn Effect is applied, Petitioner's scores are 70.90 to 69.25 on the WAIS-III and 56 on the Stanford-Binet-IV. Dr. Grant also noted that in 2005, Dr. John Hutson administered the WAIS-III to Petitioner, who received a score of 66. Application of the Flynn Effect reduces the score to 63 to 61.35. Dr. Grant opined that even if the Flynn Effect was not applied, Petitioner falls within the intellectually disabled range. Dr. Grant testified that Dr. Phillip Murphy administered the original WAIS test to Petitioner in 1988 and that Petitioner received a score of 91. Dr. Grant opined that this test was outdated by approximately thirty-three to thirty-five years. The revised edition of the WAIS (WAIS-R) was the most updated version of the test in 1988. When the Flynn Effect was applied, the score was reduced to 80.65. Dr. Grant further testified that on September 9, 1988, Dr. Edith King administered the WAIS-R, but noted a calculation and testing error. Petitioner received a full-scale score of 78, which was reduced to 75 upon application of the Flynn Effect.

Dr. Grant stated that when Petitioner was in grade school, he was administered the Lorge-Thorndike I.Q. test in which he scored in the 70s. Dr. Grant explained that this test is a group-administered test that is scored using norms based upon grade or age. Dr. Grant testified that he did not rely upon the test to determine intellectual disability but that Petitioner's score indicates that he was operating close to the intellectual disability range. Dr. Grant acknowledged that while Petitioner was in prison in Wyoming, he was administered the Beta Gamma test and received an I.Q. score of 82. Dr. Grant testified that the Beta Gamma test is not a generally accepted measure of intelligence for the diagnosis of intellectual disability as it is a group test and the norm was at least eighteen years old when the test was administered.

Dr. Grant defined "adaptive behavior" as "a collection of conceptual, social and practical skills that have been learned by people in order to function in their daily lives." Dr. Grant stated that adaptive skills must be examined in the context of the environment typical of the individual's age, peers, and culture. He explained that the assessment must be comprehensive and not limited to one narrow structured environment as the level of the individual's functioning will be higher in a structured environment. Dr. Grant testified that it would not be appropriate to assess Petitioner in the context of his criminal peers as it focuses on Petitioner's ability to adapt to one area of life rather than the total community. He further stated that a prison setting can be a support system that improves the functioning of one who is intellectually disabled.

Dr. Grant administered the Independent Living Skill (ILS) test to assess Petitioner's ability to live independently. Petitioner received full scale score of 61, a score of 55 on managing money, a score of 82 on managing the home and transportation, a score of 55 on health and safety, a score of 106 on memory and orientation, and a score of 55 on social adjustment.

Dr. Grant also examined Petitioner's academic skills and his language and communication skills, which are two of the ten areas of adaptive behavior listed in the ninth edition of the AAIDD book and also adopted in the DSM-IV. Dr. Grant administered the Oral and Written Language Scales (OWLS) in which Petitioner received a listening comprehension standard score of 69, an oral expression standard score of 68, and an oral composite score of 66. Petitioner's performance on the Peabody Picture Vocabulary Test-Third Edition (PPVT-III), which tests hearing or listening vocabulary, yielded a standard score of 80. Petitioner received a standard score of 63 on the Expressive Vocabulary Test (EVT). With regard to the Wide Range Achievement Test-Revision Three (WRAT-III), Petitioner received a standard score of 67 on the arithmetic subtest, a score of 75 on the reading subtest, and a score of 62 on the spelling subtest. His performance on the Nelson-Denny Reading Comprehension Test yielded a grade equivalent of 4.1. Petitioner received a verbal memory standard score of 57 on the Denman Neuropsychological Memory Scale, a learning standard score of 60 on the Reitan Story Memory Scale, and a standard score of 63 on the Hopkins Verbal Learning Test-Revised. Dr. Grant testified that this adaptive skill area is consistent with the intelligence tests that he administered.

Dr. Grant opined that the neuropsychological data shows that Petitioner has "fairly subtle" deficits. Dr. Grant noted that Petitioner was once involved in boxing and suffered a number of head injuries. Dr. Grant stated that the data illustrated that Petitioner's level of adaptive behavior preceded the age of eighteen and was not the result of events occurring after age eighteen. However, Dr. Grant admitted that the questions from the tests for

adaptive behavior were not designed to elicit information that would be applicable to Petitioner's lifestyles and behavior before he turned eighteen.

In assessing Petitioner's adaptive functioning, Dr. Grant also reviewed Petitioner's social history, including documents similar to those reviewed by Dr. Woods. Dr. Grant also interviewed three of Petitioner's siblings. Dr. Grant testified that Petitioner repeated the first grade, made primarily Ds and Fs throughout school, was socially promoted to the fifth grade, and repeated the ninth grade twice. An affidavit from Gail Graves Bridges states that Petitioner was in her special education class, and Petitioner's brother, David Howell, informed Dr. Grant that he and Petitioner were in special education classes together. Some of Petitioner's report cards indicate that he was operating below grade level. Dr. Grant noted that after the law regarding special education was enacted in November 1975, four of Petitioner's younger siblings were placed in special education. Dr. Grant acknowledged that Petitioner's school records do not show that he was enrolled in special education classes and that Petitioner was not tested in 1975 following the enactment of legislation regarding special education.

Dr. Grant testified that Petitioner's employment involved working as an unskilled laborer, on a barge, on a garbage truck with his father, and at Lynn Whitsett after obtaining the job through a relative. Dr. Grant also reviewed an affidavit from Jay Killis, who stated that he observed someone completing a job application for Petitioner. Dr. Grant admitted that he never spoke to the individuals who signed affidavits and that Mr. Killis never stated in his affidavit that Petitioner was unable to complete the application.

Dr. Grant opined that Petitioner suffers from adaptive behavior deficits and "meets the criteria for the [AAIDD] and diagnosis for cut offs for adaptive behavior." Dr. Grant further opined that Petitioner meets the second prong of intellectual disability under the Tennessee statute. Dr. Grant also opined that Petitioner's deficits in adaptive behavior and sub-average general functioning manifested during the developmental period.

Dr. Stephen Greenspan is a psychologist and a clinical professor at the University of Colorado Medical School. The post-conviction court declared Dr. Greenspan an expert both in psychology and intellectual disability. Dr. Greenspan testified that his role was to assess Petitioner's adaptive functioning and to determine whether Petitioner is intellectually disabled. Dr. Greenspan opined that Petitioner is intellectually disabled.

Dr. Greenspan admitted that in determining whether Petitioner was intellectually disabled, he did not use the standard provided in the Tennessee statute which requires an intelligence quotient I.Q. of 70 or below but used the standard of the AAIDD which is approximately two standard deviations below the mean. Dr. Greenspan stated in his report,

it should be noted that Tennessee criminal statute sets the upper limit for diagnosing [intellectual disability] as a score of 70. . . . As indicated in my above analysis, I believe that a more flexible interpretation of "approximately two standard deviations" (which takes into account standard errors as well as obsolescence of test norms) to be the recommended scientific standard. And I feel obligated as a scholar in the MR field to base my conclusion on the scientific standard.

Dr. Greenspan further stated in his report that "[a]s two standard deviations (2 x 15) equals 30 points, the upper IQ level for meeting the intellectual criterion for [intellectual disability] is 75 (100 minus 30 plus 5 [the reliability index]."

According to Dr. Greenspan, standard error of measurement, which refers to a range within which a person's true I.Q. score most likely falls, is one way of quantifying the unreliability of the I.Q. test. He stated that the WAIS line of tests and the Stanford-Binet line of tests are "about the most reliable psychological measures there are." Dr. Greenspan testified that the Flynn Effect should also be considered and that the AAIDD has stated that the Flynn Effect should be taken into account when diagnosing intellectual disability.

In assessing Petitioner, Dr. Greenspan reviewed the documents similar to those relied upon by Dr. Woods and Dr. Grant. Dr. Greenspan also interviewed Petitioner. Dr. Greenspan stated that no one else was present during the interview as he does not "believe that it's appropriate except in very unusual circumstances to have a third party in the room while you're doing psychological tests."

During the interview, Dr. Greenspan administered the Reynolds Intellectual Assessment Scale (RIAS), an I.Q. test, and the Dot Counting test, a malingering test. Based upon Petitioner's performance on the Dot Counting test, Dr. Greenspan opined that Petitioner was not malingering and was putting forth effort. Dr. Greenspan described the RIAS as a "brief screening test" that is "not one of the gold-standard tests like the WAIS or the Stanford-Binet." He stated that the RIAS should not be solely relied upon. Dr. Greenspan used it because it was easy to administer and gave him a "ballpark idea of where [Petitioner is] at." Dr. Greenspan stated that he did consider the RIAS in determining Petitioner's intellectual functioning. Petitioner received a verbal intelligence score of 63, a non-verbal intelligence score of 51, and a composite or full scale score of 49. Dr. Greenspan opined that Petitioner's I.Q. is higher than 49 but is "still within the [intellectually disabled] range."

Dr. Greenspan also assessed Petitioner's adaptive behavior. Dr. Greenspan testified that adaptive behavior can be determined through a review of school records, social

-10-

histories, and affidavits from family members, teachers, and employers. However, Dr. Greenspan acknowledged that such information is subjective and "can be argued from both sides." As a result, direct measures and rating instruments are also utilized. The two most widely used direct measures are the ILS test and the Street Survival Skills Questionnaire (SSSQ), which are administered in a manner similar to an I.Q. test. Dr. Greenspan stated that "[n]either are perfect instruments. But they're are the only ones we really have."

Dr. Greenspan explained that the SSSQ only measures one aspect of adaptive behavior, practical adaptive skills or daily living skills, and does not address social adaptive skills. Petitioner received a score of 55 on the SSSQ, which is in the lower range of mild intellectual disability. Dr. Greenspan opined that the score is congruent with the ILS administered by Dr. Grant in 2005 in which Petitioner received a score of 61.

Dr. Greenspan stated that the three most widely used rating instruments are the second edition of the Vineland Scale of Adaptive Behavior (Vineland-II), the second edition of the Adapted Behavior Assessment System, and the revised edition of the Scales of Independent Behavior. These rating instruments are completed by a third party who knows the individual who is being examined for intellectual disability. The scores from a rating instrument are similar to an I.Q. score but are specifically related to adaptive functioning. Dr. Greenspan explained that in conducting a retrospective assessment, the doctor must ask the third party to consistently answer each question with a particular age in mind.

Dr. Greenspan interviewed Barbara Lawrence, Petitioner's older sister, using the Vineland-II as a rating instrument of adaptive behavior. Dr. Greenspan stated that Ms. Lawrence functioned as a surrogate mother to Petitioner and their other siblings, ensuring that they were dressed and attended school. Dr. Greenspan administered the Vineland-II based upon Petitioner's retrospective target age of seventeen. Dr. Greenspan stated that he chose this age as it was within Petitioner's developmental period. Dr. Greenspan further noted that Petitioner had spent most of his adult life in prison during which Ms. Lawrence had little contact with Petitioner and his activities were not relative to Vineland-II or any other adaptive behavior instrument. Based upon the testing of Ms. Lawrence using the Vineland-II, Petitioner received a score of 61 on conceptual adaptive skills or communication, a score of 48 on practical adaptive skills or daily living skills, a score of 51 on social adaptive skills or socialization, and a full scale score of 51. Dr. Greenspan opined that in terms of adaptive functioning, Petitioner was functioning in the intellectually disabled range at the age of seventeen.

Dr. Greenspan testified that the user's guide of the AAIDD states that consideration of criminal behavior in assessing adaptive behavior deficits is inappropriate in assessing adaptive behavior deficits. He stated that there is generally insufficient information to

determine the exact demands and skills that were required to perform the criminal act. He further stated that the individual cannot be assessed based upon other criminal defendants due to the lack of norms for criminal behavior and due to the fact that intellectual disability by definition involves a comparison with the general population.

Dr. Greenspan testified that deprivation, poverty, and disadvantage do not cause an intellectual disability but will put an individual at risk. He stated that a very poor family with eight or nine children has a "good chance" of intellectual disability with one or two of those children. Dr. Greenspan noted Petitioner's difficulties while in school but acknowledged that Petitioner was successful in obtaining his GED. Dr. Greenspan noted that Petitioner's younger sibling had to help him dress in the mornings and that Petitioner never lived independently and could not maintain employment. The doctor further noted that Petitioner received severe head injuries during accidents while working on a garbage truck and on a tug boat. Most of the jobs that Petitioner obtained were due to relatives.

Dr. James Flynn is a professor of psychology and philosophy in New Zealand and the doctor after whom the Flynn Effect is named. The post-conviction court admitted Dr. Flynn as an expert in the Flynn Effect, intelligence testing, and obsolete norms. Dr. Flynn testified that clinical psychologists are advised by the AAIDD user's guide to adjust I.Q. scores in light of the Flynn Effect.

Dr. Flynn stated that he examined Petitioner's I.Q. scores and provided a report of each score after application of the Flynn Effect. Upon applying the Flynn Effect, Dr. Flynn found that Petitioner's average I.Q. of the testing to be 69.11. Moreover, in his report, Dr. Flynn stated that "[t]he true IQ of [Petitioner] is 68-69 plus or minus the usual five points for measurement error. This last might be taken to indicate that his range of scores should be something like 63 to 74 and it is in fact 56 to 81."

Dr. Flynn stated that he was not provided any information regarding the validity of the tests that he averaged. Dr. Flynn noted that one report indicated that the tester believed that Petitioner was distracted during testing. Dr. Flynn stated that "I have to be present at that testing to know whether such an impression–to give an opinion on it." Dr. Flynn was given the scores, the years, and the tests taken and was asked to provide a report based upon that information. He never met with Petitioner.

**State's Proof**

Dr. John Hutson, a clinical psychologist, was admitted by the post-conviction court as an expert in forensic psychology. Dr. Hutson testified that he was retained by the State of Oklahoma to evaluate Petitioner. Dr. Hutson was asked to evaluate whether Petitioner

had any intellectual limitations that would render him ineligible for the death penalty in Oklahoma.

Dr. Hutson interviewed Petitioner on February 16, 2005, at the maximum security unit in Nashville. Dr. Hutson testified that he was informed that Oklahoma law provided for attorneys for each party to be present for the interview. Both the Oklahoma prosecutor and Petitioner's Oklahoma counsel were present for the interview and testing. Dr. Hutson agreed with Petitioner's counsel that the presence of both counsel during testing was a possible distraction and that the reason that he does not generally have other individuals in the same room during testing is to minimize distractions. During the interview, Dr. Hutson obtained Petitioner's social history, medical history, and basic information.

Following the initial interview, Dr. Hutson administered the WAIS-III and the M-Scale, a test of malingering. The M-Scale includes questions pertaining to psychiatric symptomatology, which may include those that are fictitious or bizarre or those that can be accurate. Dr. Hutson stated that the results of the M-Scale indicated that Petitioner was not malingering psychiatric symptomatology. However, when Dr. Hutson administered the WAIS-III to Petitioner, he noted that Petitioner was "very slow and deliberate." Dr. Hutson explained that the WAIS-III is a timed test in which the tester is instructed to work as quickly as he or she can. Petitioner received a full scale IQ score of 66 with a performance I.Q. score of 67 and a verbal I.Q. score of 71. Dr. Hutson testified that he did not believe that the results reflected Petitioner's intellectual capacity. Dr. Hutson noted in his report that "[i]t appeared that this IQ score with his previously obtained IQ scores, his previously obtained achievement test scores, evidence of his written use of English from his achievement test and the vocabulary he used during my interview I feel comfortable saying that this is an under estimate of his intellectual ability." Dr. Hutson opined that Petitioner's intellectual ability was in the "high 70s at the present to possibly the low 80s approximately 20 years ago." Dr. Hutson admitted that he "didn't have a good IQ" but opined that Petitioner's I.Q. was above 70.

In his evaluation of Petitioner, Dr. Hutson also reviewed previous evaluations, Petitioner's prison records from Wyoming, his school records, and records from court proceedings in Oklahoma. Dr. Hutson noted that while in prison in Wyoming, Petitioner took the Alpha Gamma I.Q. screening test in which he received a score of 82. Dr. Hutson stated that while he relied on this test, it was only a minor part of his evaluation of Petitioner. Petitioner's prison records also included "extensive" correspondence. Dr. Hutson further noted that Petitioner had also escaped from prison which requires "some degree of planning." Dr. Hutson stated that the records of Petitioner's court proceedings indicated that Petitioner was able to converse, make plans, and consider his legal options. Dr. Hutson further stated that Petitioner's application for a work release program in

Wyoming was a record of Petitioner's behavior and indicative of his ability to function. While in prison in Wyoming, Petitioner also obtained several certificates where he completed training for different kinds of welding.

Dr. Hutson also considered Petitioner's criminal background and behavior. Dr. Hutson was taught that all behavior is relevant and to consider everything that an individual has done or may be able to do. Dr. Hutson testified that as a result of his experiences in criminal law, he has learned that some correlation exists between a person's ability and the types of crime that he or she commits. Thus, Dr. Hutson stated that a person's criminal record gives some indication about the level at which that person is functioning.

Dr. Hutson testified that the present standard rejects the application of the Flynn Effect to adjust I.Q. scores. Dr. Hutson stated that he had reviewed various reports indicating that the scores are not to be adjusted. Dr. Hutson specifically referred to an article from the Professional Psychology, Research and Practice Journal, which is published by the American Psychological Association (APA). Dr. Hutson read from an article published in the journal in 2008 titled "Adjusting IQ Scores for the Flynn Effect. Consistent with the Standard of Practice?," which concluded that

> [t]he current accepted convention does not support subtracting IQ points in the way that it departs from the requirements of the test manual. (Evaluators must also be aware that there is not agreed upon method for how diagnostic conclusions should be influenced by the Flynn effect.) Psychologists cannot conclude that adjusting scores is a generally accepted practice of evaluations for special education, parental rights determination, disability or any other purpose.

On rebuttal, Dr. Greenspan testified that Dr. Hutson improperly estimated Petitioner's I.Q. based upon his own subjective opinion. Dr. Greenspan opined that Dr. Hutson erred in failing to consider the I.Q. test results from the test that he administered and in failing to utilize a malingering test that was appropriate in diagnosing effect in a cognitive or intellectual test. However, Dr. Greenspan acknowledged the article published by the APA concluding that the Flynn Effect should not be used to adjust I.Q. scores. Dr. Greenspan testified that the Gamma Test administered to Petitioner in a Wyoming prison was unreliable because it is a group-administered test, which is never adequate for the diagnosis of intellectual disability. Dr. Greenspan stated that the circumstances surrounding the escape from prison were that Petitioner "wandered off" while intoxicated in the bed of a truck driven by others.

On October 13, 2009, the post-conviction court entered a thirty-nine-page order denying Petitioner relief. This appeal followed.

## ANALYSIS

In 1990, Tennessee Code Annotated section 39-13-203 was enacted prohibiting the execution those who are intellectually disabled at the time of committing first degree murder. See Tenn. Code Ann. § 39-13-203(b); Howell, 151 S.W.3d at 455; Van Tran v. State, 66 S.W.3d 790, 798-99 (Tenn. 2001). Although the Tennessee Supreme Court determined that this statute was not to be applied retroactively, the Court held that the execution of intellectually disabled individuals violated constitutional prohibitions against cruel and unusual punishment. Howell, 151 S.W.3d at 455 (citing Van Tran, 66 S.W.3d at 798-99); cf. Atkins v. Virginia, 536 U.S. 304, 321 (2002) (execution of intellectually disabled individuals violates the United States Constitution).

In Tennessee, "intellectual disability" rendering an individual ineligible for the death penalty requires:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3) The intellectual disability must have manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a). All three prongs must be satisfied to establish intellectual disability.

Petitioner has the burden of establishing intellectual disability by a preponderance of the evidence. See Tenn. Code Ann. § 39-13-203(c); Howell, 151 S.W.3d at 465. A preponderance of the evidence is "evidence which is of greater weight, or is more convincing, than that evidence offered in opposition." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *37 (Tenn. Crim. App., at Jackson, July 1, 2009), perm. to appeal denied (Tenn. Dec. 21, 2009) (citing 32A C.J.S. Evidence 1312 (2005)). A preponderance is evidence leading the trier of fact to find that it is more probable than not, or more likely than not, that a contested fact exists. Id. "The probabilities must be such that the conclusion is acceptable to the judgment of the court or jury applied to the evidence in the particular cause; mere proof of possibility, or possibilities, or even a preponderance of possibilities or a majority of changes, or a choice of possibilities, or

among different possibilities, never can suffice alone to establish a proposition of fact." Heck Van Tran v. State, No. W2005-01334-CCA-R3-PD, 2006 WL 3327828, at \*20 (Tenn. Crim. App., at Jackson, Nov. 9, 2006), perm. to appeal denied (Tenn. Apr. 16, 2007).

The issue of whether a petitioner is intellectually disabled and, thus, ineligible for the death penalty is a mixed question of law and fact. Id. at \*19. Accordingly, we must review the post-conviction court's findings of fact de novo, with a presumption of correctness that is overcome only if the preponderance of the evidence is contrary to the post-conviction court's findings. Id.; see Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). This Court conducts a purely de novo review of the application of the law to the facts. Fields, 40 S.W.3d at 457. No presumption of correctness attaches to the post-conviction court's conclusions of law. Id.

### A.  Tenn. Code Ann. § 39-13-203(a)(1)

The first prong of intellectual disability in Tennessee Code Annotated section 39-13-203(a) requires "[s]ignificantly subaverage general intellectual functioning as evidence by a functional intelligence quotient (I.Q.) of seventy (70) or below." Tenn. Code Ann. § 39-13-203(a)(1). In Howell, the Tennessee Supreme Court held that the demarcation of an I.Q. score of 70 was a "bright-line" rule and must be met. Howell, 151 S.W.3d at 456-59. The Court further held that the statute should not be interpreted to make allowance for any standard error of measurement or other circumstances whereby a person with an I.Q. above 70 could be considered intellectually disabled. Id. at 457-58.

However, on April 11, 2011, the Tennessee Supreme Court released its opinion in Coleman v. State, in which it held that although an individual's I.Q. is generally obtained using standardized intelligence tests, Tennessee Code Annotated section 39-13-203 neither provides clear direction regarding how an individual's I.Q. should be determined nor specifies any particular test or testing method that should be utilized. Coleman v. State, No. W2007-02767-SC-R11-PD, __ S.W.3d __(Tenn. 2011). The Court noted that section 39-13-203(a)(1) requires a "functional intelligence quotient score of seventy (70) or below" and does not require a "functional intelligence quotient *test score* of seventy (70) or below." Id. (emphasis in original). The Court concluded that as a result, "the trial court may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." Id. at __.

The Court noted that Tennessee Code Annotated section 39-13-203(a)(1) differs with clinical practice in one material respect. Id. at __. In diagnosing intellectual disability, clinicians generally report their conclusions within a range, while section 39-13-203(a)(1) requires clinicians to provide more definite testimony. Id. Thus, "an expert's opinion

regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)." Id. at __.

The Supreme Court held that in formulating such an opinion, experts may utilize relevant and reliable practices, methods, standards, and data. Id. at __. The Court noted that

> if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular tests's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

Id. at __ n. 55. The emphasis placed on clinical judgment varies depending upon "the type and amount of information available, the complexity of the issue, and the presence of one or more challenging conditions or situations." Id. at __. The trial court, however, is not required to follow any particular expert's opinion but must fully and fairly consider all evidence presented, including the results of all I.Q. tests administered to the defendant. Id. at __.

Thus, under Coleman, a trial court may accept the opinion of an expert that a defendant's I.Q. is 70 or below based upon the application of the Flynn Effect even though the defendant received an I.Q. score of 75 on the applicable test. However, Coleman does not require application of the Flynn Effect or the standard error of measurement. See Coleman, __ S.W.3d at __ n. 55. Thus, a trial court may reject the application of the Flynn Effect to adjust I.Q. scores based upon evidence of its lack of validity and consider the I.Q. score of 75 as the defendant's functional I.Q.

In the present case, the post-conviction court rejected the testimony regarding the adjustment of Petitioner's I.Q. scores downward in accordance with the Flynn Effect. In doing so, the post-conviction court considered evidence that adjusting I.Q. scores pursuant to the Flynn Effect is not a generally accepted practice, including an article from a journal published by the APA and Dr. Greenspan's testimony acknowledging the article. Moreover, Dr. Woods acknowledged that the AAIDD manual states that the Flynn Effect "still needs to be looked at and you don't necessarily need to apply it." Thus, the post-conviction court's finding does not run afoul of Coleman. Accordingly, the post-conviction court did not err in considering such testimony and rejecting adjustments of scores in accordance with the Flynn Effect.

-17-

The post-conviction court also declined to consider the standard error of measurement to adjust Petitioner's I.Q. scores. The only expert opinion presented by Petitioner regarding his I.Q. after application of the standard error of measurement was that of Dr. Flynn, who opined in his report that Petitioner's I.Q. fell within a range of 56 to 81 after adjustments for both the Flynn Effect and the standard error of measurement. However, Coleman clearly holds that a trial court may not consider an expert's opinion as to a range within which a defendant's I.Q. falls. Coleman, __ S.W.3d at __. Therefore, the trial court did not err in rejecting this opinion.

Petitioner maintains that the post-conviction court erred in weighing the results of the tests and in rejecting the opinions of his experts that his scores fell within the intellectually disabled range. Tennessee Code Annotated section 39-13-203 does not direct which particular test or testing method be used in assessing a defendant's intellectual functioning. Howell, 151 S.W.3d at 459. "A court may certainly give more weight to one test, but should do so only after fully analyzing and considering all evidence presented." Id. The record reflects that the post-conviction court carefully reviewed the results of each test and the circumstances under which they were administered. The post-conviction court also considered the Flynn Effect and the standard error of measurement as factors in determining the validity of each I.Q. test and score.

The post-conviction court summarized the intelligence testing administered to Petitioner over the course of his life as follows:

- During his elementary school education, petitioner was given the Lorge-Thorndike Test of Intelligence and received a score of 77;

- In 1980, while incarcerated in Wyoming, petitioner was given the Army's Beta Gamma Screening Test for Intelligence and received a score of 82;

- In 1988, Dr. King administered the WAIS-R and petitioner received a score of 78;

- Also, in 1988, Dr. Murphy administered the WAIS and petitioner received a score of 91;

- In 2002, Dr. Grant administered the WAIS-III; the Stanford-Binet IV; and the CTONI. Petitioner received a score of 73 on the WAIS-III and a score of 62 on the Stanford-Binet IV. On the CTONI, petitioner received a nonverbal I.Q. score of 67, a pictorial nonverbal I.Q. score of 70, and a geometric nonverbal score of 68;

- In 2005, Dr. Hutson administered the WAIS and petitioner received a score of 66.

The court gave considerable weight to the testing from the Wechsler series and the Stanford-Binet series. The post-conviction court gave "little, if any, weight" to Petitioner's score of 91 from the WAIS administered by Dr. Murphy in 1988, finding that the testing was significantly outdated at the time of testing and, thus, was not a valid test for determining Petitioner's I.Q. The court gave little weight to Petitioner's score of 66 on the WAIS-III administered by Dr. Hutson, based upon evidence that the presence of counsel during testing was "somewhat unusual and potentially distractive" and upon Dr. Hutson's opinion that the testing was invalid. The court gave minimal weight to Petitioner's score of 82 on the Beta Gamma Screening Test administered in 1980 based upon evidence that the test did not measure a full-scale I.Q. score, was only a screening tool to determine whether additional testing was necessary, and was administered in a group setting. The court gave "slightly greater weight" to Petitioner's scores on the CTONI based upon proof that the test failed to provide a full-scale I.Q. score, only measured one aspect of intelligence, and did not measure verbal functioning.

The post-conviction court gave "considerable weight" to Petitioner's I.Q. score of 78 on the WAIS-R administered by Dr. King in 2002 and his score of 73 on the WAIS-III and 62 on the Stanford-Binet IV, both of which were administered by Dr. Grant in 2002. The court also considered Petitioner's score of 77 on the Lorge-Thorndike test as it was the only testing instrument administered to Petitioner during his adolescence. The court found that Petitioner's score of 78 on the 1988 WAIS-R was in line with his score of 77 on the Lorge-Thorndike and that the 2002 WAIS-III appeared to be a more reliable measure of Petitioner's I.Q. than the Stanford-Binet IV. Although Petitioner received a score of 62 on the Stanford-Binet IV, the post-conviction court declined to find that Petitioner met the standard in Tennessee Code Annotated section 39-13-203(a)(1) based upon a test that "appears in light of all others to be out of character with petitioner's actual level of intellectual functioning." Moreover, Dr. Woods, Petitioner's own expert, opined that the WAIS-III administered by Dr. Grant in which Petitioner received a score of 73 was the most accurately scored test administered to Petitioner.

Petitioner raises issues with regard to Dr. Hutson's qualifications and an alleged conflict of interest. However, Dr. Hutson's opinion regarding the validity of the testing and his impressions of Petitioner as a result of his interview were included in Dr. Hutson's report, which Petitioner introduced as an exhibit during the presentation of his proof. Moreover, Dr. Hutson's testimony regarding the Flynn Effect was based upon the APA journal article about which the State questioned Dr. Greenspan on cross-examination.

Because such evidence was presented by means other than Dr. Hutson's live testimony, we need not consider these issues.

In finding that Petitioner did not meet the requirements of Tennessee Code Annotated section 39-13-203(a)(1), the post-conviction court considered the evidence presented and properly weighed the results of each test and the method of testing. The evidence does not preponderate against the post-conviction court's findings. Therefore, we conclude that Petitioner failed to establish by a preponderance of the evidence that he has "[s]ignificantly subaverage general intellectual functioning" as evidenced by an I.Q. of 70 or below. See Tenn. Code Ann. § 39-13-203(a)(1). Accordingly, Petitioner is not entitled to relief with regard to this issue.

## B. Tenn. Code Ann. § 39-13-203(a)(2)

The second prong of intellectual disability provided in Tennessee Code Annotated section 39-13-203(a)(2) requires "[d]eficits in adaptive behavior." Adaptive functioning refers to how effectively a person copes with common life demands and how well the person meets the standards of personal independence expected of someone in his or her particular age group, socio-cultural background, and community setting. Van Tran, 66 S.W.3d at 795 (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 40 (4th ed. 1994)). Our Supreme Court has construed the term "deficits in adaptive behavior" as "the inability of an individual to behave so as to adapt to surrounding circumstances." State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994).

An individual who is intellectually disabled will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Van Tran, 66 S.W.3d at 795 (citation omitted); see Coleman, __ S.W.3d at __. Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with [intellectual disability]." Van Tran, 66 S.W.3d at 795 (citation omitted); see Coleman, __ S.W.3d at __.

Information regarding Petitioner presented at prior proceedings is relevant in making a proper determination of intellectual disability. See Heck Van Tran, 2006 WL 3327828, at *23 (citing In re: Anderson Hawthorne, Jr., 105 P.3d 552, 559 (Cal. 2005); Morrison v. State, 583 S.E.2d 873, 876 (Ga. 2003)). The post-conviction court is not bound by the opinions of expert witnesses or by test results but may weigh and consider all evidence bearing on the issue of intellectual disability. Id. (citations omitted). Although an expert may offer an insightful opinion on the question of whether an individual satisfies the criteria

for intellectual disability, the ultimate issue of whether an individual is, in fact, intellectually disabled and, thus, ineligible for the death penalty is one for the finder of fact, based upon all of the evidence and determinations of credibility. Id. at \*24; see also Kansas v. Crane, 534 U.S. 407, 413 (2002) (noting that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law").

The adaptive behavior criteria are exceedingly subjective. However, evidentiary factors that the post-conviction court may focus upon in weighing evidence as indicative of an intellectual disability include:

1.      Did those who knew the person best during the developmental stage think the person was [intellectually disabled] at that time and, if so, act in accordance with that determination?

2.      Does the person's conduct show leadership or does it show that he is led around by others?

3.      Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

4.      Does the person respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

5.      Can the person hide facts or lie effectively in his own or others' interests?

6.      Did the commission of the offense require forethought, planning and complex execution of purpose?

Heck Van Tran, 2006 WL 3327828, at \*24 (citing Ex parte Jose Garcia Briseno, 135 S.W.3d 1 (Tex. Crim. App. 2004).

The post-conviction court found that while Petitioner established deficits in academic functioning, he failed to establish additional deficits in adaptive behavior. The lower court rejected the results of the standardized tests and the opinions of Petitioner's experts as they related to the claims of additional deficits, finding that the testing was done retroactively and was contradicted by Petitioner's conduct. We recognize that forensic assessments of adaptive deficits are more difficult than in clinical situations due, in part, to the fact that one

is requested to perform a retrospective diagnosis under less than optimal circumstances. See Thomas v. Allen, 614 F.Supp.2d 1257, 1289 (N.D. Ala. 2009).

As noted by the post-conviction court, Petitioner presented no lay testimony from relatives, friends, or others regarding his adaptive functioning. Rather, he presented the testimony of mental health experts who based their opinions on records, affidavits, and other statements. The court noted that as a result, little information was presented regarding the "day to day functioning of the petitioner during his childhood and early adolescence other than information which was provided either for litigation or diagnostic purposes."

Much of the information included in the affidavits and transcripts of prior proceedings focused upon Petitioner's deficits in academic functioning. However, the additional information in these documents supports the post-conviction court's finding of the lack of additional deficits. Although Dr. Greenspan testified that Petitioner was unable to "hold a job," the evidence which he reviewed in reaching this opinion demonstrates otherwise. The record shows a rather extensive job history in light of the fact that, according to Dr. Greenspan, Petitioner has been incarcerated for most of his adult life. When Petitioner was fourteen or fifteen years old, he obtained employment on a garbage truck performing the work of an adult. Petitioner's subsequent employment included working at a metal company, for a bricklayer, and on a barge. No proof was presented that Petitioner was inept, incompetent, or repeatedly terminated from employment.

The transcript of the testimony of Emily Clutts, Petitioner's mother, during proceedings in Oklahoma reveals Petitioner's ability to communicate through letters. Ms. Clutts testified that after Petitioner was incarcerated in Wyoming, he communicated to her through letters and that his writing and spelling improved "tremendously." The transcript of an exchange between Petitioner and the trial judge in his Oklahoma proceedings demonstrates that Petitioner is able to understand abstract concepts, devise a strategy to aid in his defense, and communicate his opinions and offer input regarding his defense.

Finally, the circumstances of the offenses for which Petitioner was convicted contradict the assertions regarding the Petitioner's additional deficits in adaptive behavior. Although Petitioner maintains that his criminal conduct should not be considered in examining whether he has deficits in adaptive functioning, this Court has held otherwise. See Heck Van Tran, 2006 WL 3327828, at *25. In Heck Van Tran, this Court held that

> [i]n the legal setting, the court must not become so entangled with the opinions of psychiatric experts that we lose sight of the nature of the criminal offense itself. We must also not turn a blind eye to the defendant's ability to use society to better his needs. There are [intellectually disabled] persons who

are criminal, but they tend to commit fairly primitive crimes, impulsive crimes, and sudden acts of violence. The more complex the crime, however, the less likely that the person is [intellectually disabled].

Id.

Our review of the facts and circumstances of Petitioner's convictions reflect that Petitioner adapted and adjusted to his surroundings throughout the course of his three state crime spree from which his murder convictions in Tennessee and Oklahoma arose. Petitioner devised and carried out a plan to steal the keys to a truck owned by his former employer, obtain a firearm, and later take the truck. Petitioner killed a convenience store clerk during a robbery in order to avoid detection. He then had the presence of mind to flee Tennessee. Petitioner traveled to Oklahoma where he attempted to dispose of the truck, stole another vehicle, and killed the owner of the vehicle. In an effort to avoid detection, Petitioner replaced the license plates on the stolen Oklahoma vehicle with stolen license plates from another Tennessee vehicle. He then fled to Florida where he evaded arrest for almost one month. Thus, Petitioner's active participation and planning in the offenses are at the "opposite end of the spectrum from [the] behavior of [intellectually disabled] offenders." Atkins, 536 U.S. at 319-20.

"The determination of what constitutes [intellectual disability] in a particular case varies sharply depending upon who performs the analysis and the methodology used." Heck Van Tran, 2006 WL 3327828, at *25. Even though Petitioner's experts testified that Petitioner exhibits multiple deficits in adaptive behavior, the post-conviction court found that Petitioner established only one deficit, that of academic functioning. We conclude that the post-conviction court's findings are supported by the record. Because Petitioner has failed to establish at least two deficits in adaptive behavior, he is not entitled to relief with regard to this issue.

### C. Tenn. Code Ann. § 39-13-203(a)(3)

The third prong of intellectually disability provided in Tennessee Code Annotated section 39-13-203(a)(3) requires that the intellectual disability manifest "during the developmental period, or by eighteen (18) years of age." Both the significantly subaverage intellectual functioning and deficits in adaptive behavior must have manifested by the age of eighteen. State v. Strode, 232 S.W.3d 1, 16 (Tenn. 2007). Because we conclude that Petitioner did not demonstrate significantly subaverage general intellectual functioning evidenced by an I.Q. of 70 or below and deficits in adaptive behavior, we conclude no manifestation of intellectual disability was present prior to the age of eighteen.

**CONCLUSION**

After reviewing the records and the argument of both parties, we conclude that Petitioner failed to establish that he is intellectually disabled in accordance with Tennessee Code Annotated section 39-13-203(a). Therefore, the judgment of the post-conviction court is affirmed.

_____

THOMAS T. WOODALL, JUDGE