# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
## June 3, 2014 Session

## TYRONE CHALMERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P24965    Don R. Ash, Special Judge**

---

**No. W2013-02317-CCA-R3-PD - Filed June 30, 2014**

---

The petitioner, Tyrone Chalmers, appeals from the Shelby County Criminal Court's denial of his petition for writ of error coram nobis in which he challenged his death sentence resulting from his 1997 conviction for first degree felony murder. On appeal, the petitioner contends that he is entitled to coram nobis relief because he is intellectually disabled and, therefore, ineligible for the death penalty. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Paul J. Bruno, Nashville, Tennessee, for the appellant, Tyrone Chalmers.

Robert E. Cooper, Jr., Attorney General & Reporter; James E. Gaylord, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Muriel Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 1997, the petitioner was convicted of first degree felony murder and especially aggravated robbery. The jury sentenced him to death after finding that the evidence of an aggravating circumstance – that the petitioner was previously convicted of one or more felonies, other than the present charge, whose statutory elements involved the use of violence of the person, see Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1994) – outweighed evidence of any mitigating circumstances beyond a reasonable doubt. The trial court sentenced the

petitioner to twenty years for the especially aggravated robbery conviction, to run concurrently with the death sentence but consecutively to sentences previously imposed in another case. The Tennessee Supreme Court affirmed the petitioner's convictions and sentences on direct appeal. See State v. Chalmers, 28 S.W.3d 913, 915 (Tenn. 2000).

The evidence presented at trial was summarized by the Tennessee Supreme Court on direct appeal as follows:

At approximately 5:00 a.m. on August 20, 1994, the body of the African-American victim, 28-year-old Randy Allen, was discovered lying face down on the sidewalk next to Netherwood Street in Memphis. His pants and underwear had been pulled down around his ankles, and he had been shot five times. Two of the wounds, one to the head and another to the back, were fatal.

Ten days after the shooting, the 21-year-old African-American defendant admitted to Memphis police that he had killed the victim during a robbery. The defendant stated:

I met up with "Dre" and "Black" on Orleans and So. Parkway near the park. "Black" was driving something like a [sic] Oldsmobile, "Dre" was in the front passenger seat and I got in the back seat. We were just riding around looking for somebody to rob. I had some kind of automatic rifle, it had a clip in it, black and brown color. "Dre" had a .380 automatic or something, look [sic] black to me. I think "Black" had a shotgun. "Black" was driving down Netherwood, and me and "Dre" jumped out on two boys.[1] We tried to rob them. We made them strip, then I had hit the one that was killed with the rifle and it went off, and I couldn't let the rifle go. Then me and "Dre" jumped in the car and left, with "Black" driving. Then "Black" dropped me and "Dre" off near a house, close to Southside School.

The defendant, who robbed Murphy and the victim of $ 3.00, estimated that he had fired six times. The defendant concluded his statement by remarking, "I'm sorry it ever happened. If I could go through it again, I

---

[1] These "two boys" were the victim and his cousin, Marlon Murphy. The defendant was also indicted for the aggravated robbery of Murphy, but the charge was dismissed due to Murphy's unavailability as a witness for the prosecution.

wouldn't."

. . . .

During the sentencing phase, the State introduced evidence of the defendant's previous convictions for attempted especially aggravated robbery and attempted first degree murder for a criminal episode occurring on the same date as the present offenses. The Deputy Clerk for the Shelby County Criminal Court Clerk's Office testified that, according to the court records, Tyrone Chalmers was convicted of attempted especially aggravated robbery and attempted first degree murder on July 8, 1996, for offenses committed against Joseph Hunter on August 20, 1994. During cross-examination, defense counsel contested the clerk's identification of the defendant, asking, "You have no way of knowing whether or not those documents that you have are in fact, belong to [sic] Tyrone Chalmers, do you? You have no personal knowledge yourself, do you?" Hunter, the victim of those prior crimes, then testified that he was driving home at approximately 2:55 a.m. on August 20, 1994, when the defendant stepped in front of his car, pointed a rifle at him, and told him to "give it up." According to Hunter, the defendant fired approximately fifteen rounds at him as he drove away, striking Hunter in the leg and arm.

The defendant presented the testimony of his mother and sister. His mother testified that the defendant was one of seven children, had graduated from high school, and had never given her any trouble. At the time of these offenses, the defendant was employed and was caring for his mother who suffered from diabetes. The defendant's sister described the defendant as "a very caring person" and her best friend. She conceded that he had been in juvenile court once but claimed that the victim of that offense had "actually committed a crime" against the defendant.

The last witness was the defendant, who testified that only hours before he committed these offenses he had been drinking alcohol and had smoked crack cocaine for the first time. He claimed that he could not remember what happened but did recall that the gun he used belonged to one of the accomplices. He admitted having been in juvenile court but asserted that the only criminal charges he had ever faced were those arising from the events of the early morning hours of August 20, 1994. The defendant told the victim's family that he was sorry and expressed his desire to take the victim's place if he could. On cross-examination, the defendant admitted that he tried to rob

Hunter before he ever met up with Dre and Black.

Id. at 915-17.

## Post-Conviction Proceedings

On April 19, 2001, the petitioner filed a pro se petition for post-conviction relief claiming that his counsel were ineffective. The petitioner, through counsel, filed an amended petition in September 2003 claiming that he was intellectually disabled and, therefore, ineligible for the death penalty.

During the August 2005 evidentiary hearing, the petitioner presented the testimony of Dr. Keith Caruso as an expert in general and forensic psychiatry. Dr. Caruso testified that the petitioner had a verbal I.Q. score of 73, a performance I.Q. score of 85, and a full-scale I.Q. score of 77. Dr. Caruso further testified that the petitioner fell within the borderline range of intellectual functioning.

The petitioner appeared to have abandoned his claim of intellectual disability during the post-conviction hearing. The post-conviction court did not address the intellectual disability issue in denying the petitioner post-conviction relief. The petitioner did not raise the issue in his appeal of the denial of post-conviction relief in this court. On appeal, this court affirmed the post-conviction court's judgment. See Tyrone Chalmers v. State, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *1 (Tenn. Crim. App. June 25, 2008), perm. app. denied (Tenn. Dec. 22, 2008).

## Intellectual Disability Proceedings

On April 10, 2012, the petitioner filed a motion to reopen post-conviction proceedings in which he alleged that he is intellectually disabled and, therefore, ineligible for the death penalty. He argued that the Tennessee Supreme Court's decision in Coleman v. State, 341 S.W.3d 221 (Tenn. 2011), established a new constitutional right that was not recognized at the time of his trial. He also argued that he has new scientific evidence that he is intellectually disabled and, therefore, actually innocent of capital murder and the death penalty.

The petitioner attached to his motion the April 9, 2012 affidavit of Dr. Daniel Reschly, a professor of education and psychology at Vanderbilt University. According to Dr. Reschly, the petitioner was administered the Wechsler Intelligence Scale for Children-Revised (WISC-R) in 1985, and he received a full-scale I.Q. score of 78. Dr. Reschly applied the Flynn Effect to adjust the petitioner's I.Q. score to 73.7. On October 20, 2009, Dr. Reschly

-4-

administered the Wechsler Adult Intelligence Test-IV (WAIS-IV) to the petitioner, and the petitioner's full-scale I.Q. score was 76. Dr. Reschly applied the Flynn Effect to adjust the petitioner's I.Q. score of 75.

Dr. Reschly noted issues with the accuracy of the Wechsler Scales norms for both the children and adult scores at the very high and very low levels of intellectual functioning. As a result, Dr. Reschly administered the Stanford-Binet Intelligence Scales, Fifth Edition (SB-V) on March 16, 2012, and the petitioner's full-scale I.Q. score was 70. Dr. Reschly adjusted the petitioner's I.Q. score to 66.4 based upon the Flynn Effect. He concluded that based upon his clinical judgment and consideration of the Flynn Effect, estimation of error in the test, practice effect, and cultural differences, the petitioner's "functional intelligence clearly is at or below 70."

Dr. Reschly concluded that the petitioner has significant deficits in adaptive behavior due to substantial limitations in the conceptual skills, social skills, and practical skills domains. He further concluded that the petitioner's functional intelligence and significant deficits in adaptive behavior were present prior to the age of eighteen. Dr. Reschly opined that the petitioner is intellectually disabled.

On December 20, 2012, the Tennessee Supreme Court released its opinion in Keen v. State, 398 S.W.3d 594 (Tenn. 2012), in which the court rejected the bases upon which the petitioner sought to reopen his post-conviction proceedings. According to the trial court's order, on February 1, 2013, the petitioner amended his motion to include a petition for writ of error coram nobis and directly invoked the intellectual disability provisions in Tennessee Code Annotated section 39-13-203. The trial court's order states that the State filed a response seeking summary dismissal and that the petitioner filed a reply brief.[2]

On September 19, 2013, the trial court entered an order denying relief. The trial court found that the grounds asserted by the petitioner in his motion to reopen were precluded by Keen. The trial court noted that in support of his petition for a writ of error coram nobis, the petitioner alleged that his 2012 evaluation constituted new evidence that he is ineligible for the death penalty. The trial court found that information regarding the potential issue of intellectual disability had been available to the petitioner for many years but that the writ was not filed until February of 2013, more than fifteen years after the judgment became final and almost ten years after the petitioner first raised the issue in post-conviction proceedings. The trial court further found that "[m]erely having an expert perform yet another evaluation like others [had] done in the past does not satisfy the criteria for tolling the statute." The trial

_____

[2]The petitioner's amended motion, the State's response, and the petitioner's reply brief are not included in the record on appeal.

court concluded that the petitioner's petition for a writ of error coram nobis was barred by the one-year statute of limitations and that the petitioner failed to establish a sufficient basis to justify tolling of the limitations period. The trial court also denied the petitioner's claim that he should be allowed to directly invoke the provisions of Tennessee Code Annotated section 39-13-203.

The petitioner filed in this court an application for permission to appeal the trial court's denial of his motion to reopen pursuant to Supreme Court Rule 28. On January 14, 2014, this court entered an order denying the petitioner's application for permission to appeal and holding that in Keen, the Tennessee Supreme Court rejected the bases upon which the petitioner sought to reopen post-conviction proceedings. See Tyrone Chalmers v. State, No. W2013-02329-CCA-R28-PD (Tenn. Crim. App. Jan. 14, 2014), perm. app. filed (Tenn. Mar. 14, 2014). The petitioner also filed a notice of appeal pursuant to Rule 3, Tennessee Rules of Appellate Procedure, regarding his claims of coram nobis relief and relief pursuant to Tennessee Code Annotated section 39-13-203.

## ANALYSIS

The petitioner contends that the post-conviction court erred in denying his petition for writ of error coram nobis in which he claimed that he is intellectually disabled and, therefore, ineligible for the death penalty. He also contends that he should be allowed to directly invoke the provisions of Tennessee Code Annotated section 39-13-203 to establish that he is intellectually disabled.

### A. Intellectual Disability and the Death Penalty

In 1990, Tennessee Code Annotated section 39-13-203 was enacted prohibiting the execution of defendants who were intellectually disabled at the time that they committed first degree murder. See Tenn. Code Ann. § 39-13-203(b); State v. Howell, 151 S.W.3d 450, 455 (Tenn. 2004); State v. Van Tran, 66 S.W.3d 790 (Tenn. 2001). Although the statute is not to be applied retroactively, the execution of intellectually disabled individuals violates constitutional prohibitions against cruel and unusual punishment. Howell, 151 S.W.3d at 455 (citing Van Tran, 66 S.W.3d at 798-99); see Atkins v. Virginia, 536 U.S. 304, 321 (2002).

In Tennessee, "intellectual disability" rendering a defendant ineligible for the death penalty requires:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3) The intellectual disability must have manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a). All three prongs must be satisfied to establish intellectual disability.

The defendant has the burden of establishing intellectual disability by a preponderance of the evidence. See Tenn Code Ann. § 39-13-203(c); Howell, 151 S.W.3d at 465. The issue of whether a defendant is intellectually disabled and, thus, ineligible for the death penalty is a mixed question of law and fact. State v. Strode, 232 S.W.3d 1, 8 (Tenn. 2007). A trial court's findings of fact are binding on this court unless the evidence preponderates against those findings. Id. The trial court's application of the law to those facts is reviewed de novo. Id.

The first prong of intellectual disability under section 39-13-203(a)(1) requires "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below." In applying this provision, the Tennessee Supreme Court held in Howell that the demarcation of an I.Q. of 70 was a "bright-line" rule that must be met. Howell, 151 S.W.3d at 456-59. Following Howell, Tennessee Supreme Court released its opinion in Coleman v. State, 341 S.W.3d 221, 241 (Tenn. 2011), holding that although an individual's I.Q. is generally obtained through standardized intelligence tests, section 39-13-203 does not provide clear direction regarding how an I.Q. should be determined and does not specify any particular test or testing method that should be utilized. The court noted that section 39-13-203(a)(1) requires a "functional intelligence quotient of seventy (70) or below" and does not require a "functional intelligence quotient *test score* of seventy (70) or below." Coleman, 341 S.W.3d at 241 (emphasis in original). Therefore, "the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." Id.

The supreme court noted that section 39-13-203(a)(1) differs with clinical practice in one material respect. Id. at 247. In diagnosing intellectual disability, clinicians generally report their conclusions regarding an individual's I.Q. within a range, and section 39-13-201(a)(1) requires more definite testimony. Id. As a result, "an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)." Id. at 242.

In determining whether a defendant's functional I.Q. is 70 or below, "a trial court should consider all evidence that is admissible under the rules for expert testimony." Keen v. State, 398 S.W.3d 594, 605 (Tenn. 2012). Experts may use relevant and reliable practices, methods, standards, and data in formulating their opinions. Coleman, 341 S.W.3d at 242. Moreover,

> if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

Id. at n.55. The emphasis to be placed upon clinical judgment varies depending upon "the type and amount of information available, the complexity of the issue, and the presence of ore or more challenging conditions or situations." Id. at 246. The trial court is not required to follow any particular expert's opinion but must fully and fairly consider all evidence presented, including the results of all I.Q. tests administered to the defendant. Id. at 242.

Following Coleman, the Tennessee Supreme Court released its opinion in Keen v. State, 398 S.W.3d 594 (Tenn. 2012), addressing the issue of whether a capital petitioner may allege intellectual disability as a basis for reopening post-conviction proceedings. The petitioner in Keen sought to reopen post-conviction proceedings on the ground that he possessed new scientific evidence of actual innocence. Keen, 398 S.W.3d at 598. The evidence consisted of a newly-obtained I.Q. score of 67, which the petitioner claimed established that he was intellectually disabled and, therefore, "actually innocent" of the death penalty. Id. The petitioner also asserted that Coleman established a new rule of constitutional criminal law that required retroactive application. Id. at 599. The Tennessee Supreme Court rejected both of the bases upon which the petitioner sought to reopen post-conviction proceedings. The court specifically held that Coleman addressed the interpretation and application of Tennessee Code Annotated section 39-13-203 and was not a constitutional ruling. Id. at 609. The court further held that "a claim alleging ineligibility for the death penalty does not qualify as an actual innocence claim." Id. at 613. While remaining "committed to the principle that Tennessee has no business executing persons who are intellectually disabled," the court held that the petitioner failed to meet the requirements for reopening post-conviction proceedings. Id.

In addressing its holdings in Howell and Coleman, the court noted:

Regrettably, several courts misconstrued our holding in Howell that Tenn. Code Ann. § 39-13-203(a)(1) established a "bright line rule" for determining intellectual disability. They understood this language to mean that courts could consider *only* raw I.Q. scores. Accordingly, these courts tended to disregard any evidence suggesting that raw scores could paint an inaccurate picture of a defendant's actual intellectual functioning. This was an inaccurate reading of Howell, in which we took pains to say that the trial court should "giv[e] full and fair consideration to all tests administered to the petitioner" and should "fully analyz[e] and consider[] all evidence presented" concerning the petitioner's I.Q.

Id. at 603 (citations omitted) (emphasis in original). The petitioner requested that the court remand his case for a new hearing on the issue of intellectual disability, just as the court had done in Coleman and in Smith v. State. See Smith v. State, 357 S.W.3d 322, 354-55 (Tenn. 2011); Coleman, 341 S.W.3d at 252-53. The court in Keen, however, rejected the petitioner's contention noting that Coleman and Smith took advantage of the one-year window for reopening their petitions following the recognition of the constitutional prohibition against executing intellectually disabled defendants in Van Tran and Atkins. Keen, 398 S.W.3d at 613. The petitioner in Keen failed to avail himself of that opportunity. Id.

## B. Writ of Error Coram Nobis

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Our supreme court has stated the stand of review as "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might

have been different." State v. Vazques, 221 S.W.3d 514, 525-28 (Tenn. 2007) (citation omitted).

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a petition for writ of error coram nobis are not limited to specific categories. Harris v. State, 102 S.W.3d 587, 592 (Tenn. 2003). Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner establishes that he or she was "without fault" in failing to present the evidence at the proper time. Id. Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. Id. at 592-93. The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. Vazques, 221 S.W.3d at 527-28.

The State asserts that the petitioner's claim is barred by the statute of limitations. Coram nobis claims are subject to a one-year statute of limitations. Tenn. Code Ann. § 27-7-103. The statute of limitations is computed "from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). The issue of whether a claim is barred by an applicable statute of limitations is a question of law, which this court reviews de novo. See id. We must construe the coram nobis statute of limitations "consistent with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim." Id.

The one-year statute of limitations may be tolled on due process grounds if the petitioner seeks relief based upon newly discovered evidence of actual innocence. Wilson, 367 S.W.3d at 234. In determining whether tolling is proper, the court must balance the petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless. Harris, 301 S.W.3d at 145 (citing Workman v. State, 41 S.W.3d 100, 102 (Tenn. 2001)). Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992). The Burford rule consists of three steps:

(1) determine when the limitations period would normally have begun to run; (2) determine whether the ground for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable

opportunity to present the claim.

Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995).

The limitations period normally would have begun to run following the petitioner's trial in 1997. The petitioner filed his petition for writ of error coram nobis on February 1, 2013, approximately fifteen years after the one-year statute of limitations expired.

In 1990, Tennessee Code Annotated section 39-13-203, prohibiting the execution of intellectually disabled defendants, was enacted. The petitioner, however, did not raise the issue of intellectual disability during his 1997 trial. In 2001, our supreme court recognized that the execution of intellectually disabled defendants is constitutionally prohibited. See Van Tran, 66 S.W.3d at 798-99. The petitioner raised a claim of intellectual disability in his amended petition for post-conviction relief. However, he abandoned the issue after his expert, Dr. Caruso, testified during the evidentiary hearing that the petitioner fell within the borderline range of intellectual functioning.

The petitioner contends that Dr. Reschly's report is "newly available" evidence or evidence that did not become available for presentation until after the trial concluded. While the petitioner acknowledges that his intellectual disability existed before trial, he argues that circumstances beyond his control prevented him from presenting such evidence. He submits that his intellectual disability first became available for presentation following our supreme court's opinion in Coleman.

Generally, to qualify as newly discovered evidence, the evidence must not have been known to the defendant at the time of trial. Wlodarz v. State, 361 S.W.3d 490, 506 (Tenn. 2012). A narrow exception, however, exists where "'although not newly discovered evidence, in the usual sense of the term,'" the "'*availability*'" of the evidence "'is newly discovered.'" Harris v. State, 301 S.W.3d at 160-61 (Koch, J., concurring) (quoting Taylor v. State, 171 S.W.2d 403, 405 (Tenn. 1943)); see David G. Housler, Jr. v. State, No. M2010-02183-CCA-R3-PC, 2013 WL 5232344, at *44 (Tenn. Crim. App. Sept. 17, 2013).

Courts have applied this narrow exception where previously unavailable evidence became available following a change in factual circumstances. See, e.g., Taylor, 171 S.W.2d at 405 (applying the exception when at the time of trial, one witness was hospitalized and one witness was working outside the state and they later became available to testify); Misty Jane Brunelle v. State, No. E2010-00662-CCA-R3-PC, 2011 WL 2436545, at *10 (Tenn. Crim. App. June 16, 2011), perm. app. denied (Tenn. Oct. 18, 2011) (noting that the petitioner should have sought coram nobis relief when a DCS report that was known to the petitioner but sealed at the time of trial later became available). Many of these cases involve testimony

-11-

of a co-defendant or a witness who previously refused to testify by asserting the constitutional privilege against self-incrimination. See, e.g., David G. Housler, Jr., 2013 WL 5232344, at *44; United States v. Guillette, 404 F. Supp. 1360, 1372-74 (D. Conn. 1975); Brantley v. State, 912 So. 2d 342, 343 (Fla. App. 2005); State v. Williams, 246 So. 2d 4, 6 (La. 1971); Commonwealth v. Brown, 431 A.2d 343, 344 (Pa. Super. Ct. 1981); State v. Gerdes, 258 N.W.2d 839, 843 (S.D. 1977).

The petitioner has failed to cite to any authority applying this narrow unavailability exception based upon a change in the law. Issues regarding whether a change in the law should apply post-trial relate to retroactivity and are more properly addressed in post-conviction proceedings or a motion to reopen post-conviction proceedings. Even if the unavailability exception applies to a change in law, the petitioner is not entitled to relief.

The petitioner argues that prior to Coleman, courts only could consider raw I.Q. scores in determining intellectual disability pursuant to Tennessee Code Annotated section 39-13-203(a)(1). The Tennessee Supreme Court in Keen, however, stated that Howell did not provide for such a limitation. Keen, 398 S.W.3d at 603. Rather, the court in Howell instructed trial courts to "'giv[e] full and fair consideration to all tests administered to the petitioner'" and to "'fully analyz[e] and consider[] all evidence presented'" concerning the petitioner's I.Q. Id. (quoting Howell, 151 S.W.3d at 459).

Moreover, the Tennessee Supreme Court noted in Coleman that its review of all cases involving the application of section 39-13-203 reflected that "the parties and the courts have not been limiting their consideration of whether a criminal defendant has a 'functional intelligence quotient of seventy (70) of below' to the defendant's raw I.Q. test scores." Coleman, 341 S.W.3d at 247. The court explained:

> For example, in Cribbs v. State, both the State and Mr. Cribbs presented evidence that his raw I.Q. test scores did not accurately reflect his actual I.Q. On behalf of the State, Dr. Wyatt Nichols stated that Mr. Cribbs's intellectual level was actually higher than the I.Q. test score of 73 and was "[m]ore like the mid to high 80s." Cribbs v. State, 2009 WL 1905454, at *22, 32. Dr. Pamela Auble, appearing for Mr. Cribbs, stated in her initial report that his I.Q. was between 71 and 84. Cribbs v. State, 2009 WL 1905454, at *17. However, Dr. Auble later revised her opinion based on information obtained after her first report and concluded that Mr. Cribbs's I.Q. was below seventy. Cribbs v. State, 2009 WL 1905454, at *17. Based on all the evidence, the trial court concluded that the I.Q. test that produced the score of 73 was the most reliable. The trial court found that Dr. Auble's explanation for the change in her opinion was not credible and that Dr. Nichols's testimony was persuasive.

-12-

Cribbs v. State, 2009 WL 1905454, at *32.

> The consideration of I.Q. test scores in Cribbs v. State is but one example of cases in which the State has argued and presented evidence that scores on I.Q. tests should not be considered on their face value. See also State v. Strode, 232 S.W.3d at 5 (the State presented evidence challenging the score on the basis that the defendant had been malingering); Smith v. State, 2010 WL 3638033, at *30 (the State presented evidence that the defendant's I.Q. test score should be discounted because of malingering); Van Tran v. State, 2006 WL 3327828, at 4-6 (the State argued that the Vietnamese-born defendant's low I.Q. test score reflected cultural and linguistic bias).

Id. The Tennessee Supreme Court concluded that these cases reflected "the parties' and the courts' existing awareness that, as a practical matter, a criminal defendant's 'functional intelligence quotient' cannot be ascertained based only on raw I.Q. scores." Id. The court further concluded that the cases also reflected "the parties' conclusion that Tenn. Code Ann. § 39-13-203(a) does not prevent them from presenting relevant and competent evidence, other than the defendant's raw I.Q. test scores, either to prove or to disprove that the defendant's 'functional intelligence quotient' when the crime was committed was 'seventy (70) or below.'" Id. at 247-48.

We note that recently in Hall v. Florida, __ U.S. __, 134 S. Ct. 1986 (2014), the United States Supreme Court held that Florida courts' interpretation of the significantly subaverage intellectual functioning provision in Florida's intellectual disability statute is unconstitutional. Florida courts interpreted the statute as requiring a strict I.Q. raw test score of 70 without consideration of the standard error of measurement. Hall, __ U.S. at __, 134 S. Ct. at 1995-2000. The Supreme Court agreed "with medical experts that when a defendant's I.Q. test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. Unlike the defendant in Hall, however, the petitioner has not been precluded during his original trial or during post-conviction proceedings from presenting evidence, other than his raw I.Q. test scores, to establish that his "functional intelligence quotient" when he committed the murder was 70 or below.

Accordingly, contrary to the petitioner's claims, the information in Dr. Reschly's report regarding the issue of intellectual disability was available for presentation prior to Coleman. Dr. Caruso testified during post-conviction proceedings on August 16, 2005, following the Tennessee Supreme Court's release of Howell on November 16, 2004. Nothing prevented the petitioner from presenting during post-conviction proceedings relevant and competent evidence, other than his raw I.Q. test scores, to prove that his

"functional intelligence quotient" when the crime was committed was "seventy (70) or below."

During the post-conviction hearing, Dr. Caruso testified regarding the petitioner's poor grades in school and his enrollment in special education classes. Dr. Caruso noted that the petitioner had a verbal I.Q. score of 73, a performance I.Q. score of 85, and a full-scale I.Q. score of 77. Dr. Caruso further noted that the petitioner was very limited in his verbal ability. Neuropsychological testing was conducted, and Dr. Caruso found evidence of "a mixed receptive and expressive language disorder" and attention deficit hyperactivity disorder. Dr. Caruso referred to the petitioner's "intellectual deficits" throughout his testimony. Dr. Caruso, however, concluded that the petitioner's intellectual functioning was borderline.

More than seven years after Dr. Caruso testified, the petitioner filed his petition seeking to present testimony from a mental health expert who reached a conclusion that differed from the conclusion reached by Dr. Caruso during post-conviction proceedings. The information upon which Dr. Reschly relied was available to the petitioner at the time of the trial and the post-conviction hearing. Nothing prevented the petitioner from undergoing additional I.Q. testing prior to the trial or post-conviction proceedings. The new I.Q. testing in 2009 and 2012 is merely cumulative to the evidence previously available to the petitioner. See Wlodarz, 361 S.W.3d at 499 (noting that newly discovered evidence that is merely cumulative does not warrant the issuance of a writ). Because the petitioner's claim could have been litigated at trial or during post-conviction proceedings, the grounds are not "later-arising," justifying the tolling of the one-year statute of limitations. See Tenn. Code Ann. § 40-26-105(b) (confining coram nobis relief to "matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding" and requiring the defendant to show that he was without fault in failing to present the evidence at the proper time).

Even if Coleman provides new grounds for relief, the petitioner did not file his petition for writ of error coram nobis until February 2013, almost twenty-two months following the issuance of Coleman. The petitioner asserts that the coram nobis petition should relate back to his motion to reopen his post-conviction petition filed in April 2012. "No statute in Tennessee nor tolling rule developed at common law provides that the time for filing a cause of action is tolled during the period in which a litigant pursues a related but independent cause of action." Harris, 301 S.W.3d at 146. When the petitioner filed his motion to reopen, he chose not to file a petition for writ of error coram nobis. It was not until after our supreme court released its opinion in Keen rejecting the bases upon which the petitioner relied in filing his motion to reopen that the petitioner filed a petition for writ of

-14-

error coram nobis. A petitioner may not delay presenting a coram nobis claim until "every other avenue of relief ha[s] been exhausted." Billy Ray Irick v. State, No. E2010-02385-CCA-R3-PD, 2011 WL 1991671, at *18 (Tenn. Crim. App., at Knoxville, May 23, 2011), perm. app. denied (Tenn. Aug. 25, 2011). Therefore, we conclude that under the circumstances of this case, the delay in seeking coram nobis relief is unreasonable.

We conclude that the trial court properly found that the petitioner's petition was barred by the one-year statute of limitations. Accordingly, the petitioner is not entitled to coram nobis relief.

## C. Intellectual Disability Statute

The petitioner asserts that the intellectual disability provisions in Tennessee Code Annotated section 39-13-203 provide an independent cause of action allowing him to challenge his eligibility for the death penalty. In construing a statute, we must ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. State v. Strode, 232 S.W.3d 1, 9 (Tenn. 2007). We must give the words in the statute their natural and ordinary meaning in light of their statutory context. Keen, 398 S.W.3d at 610. We must avoid any "forced or subtle construction that would limit or extend the meaning of the language." Id. (citation omitted). "If the statutory language is clear and unambiguous, we apply the statute's plain language in its normal and accepted use." Id.

Tennessee Code Annotated section 39-13-203 lists the requirements of intellectual disability, the burden of proof, and the procedure when the issue is raised at trial. The plain language of the statute does not create an independent cause of action allowing a defendant to challenge his or her eligibility for the death penalty. Had the General Assembly intended to create a separate and independent cause of action in which to allege intellectual disability, they would have stated so in the statute. See, e.g., Tenn. Code Ann. § 40-30-301, *et seq.* (creating a cause of action to allow certain defendants to request DNA testing of evidence). The petitioner is not entitled to relief with regard to this issue.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE